VICON, INC., Plaintiff-Appellee,
Cross-Appellant,

v.

CMI CORPORATION,
Defendant-Appellant,
Cross-Appellee.

No. 80–3324.

United States Court of Appeals,
Fifth Circuit.

Unit A

Sept. 30, 1981.

Rehearing Denied Dec. 23, 1981.

George E. Morse, Gulfport, Miss., Jerry Dunlap, Oklahoma City, Okl., Herschel L. Abbott, Jr., Michael L. Stone, Marie A. Moore, New Orleans, La., for defendant-appellant, cross-appellee.

Butler, Snow, O'Mara, Stevens & Canada, Stephen W. Rosenblatt, Thomas M. Prewitt, Jackson, Miss., for plaintiff-appellee, cross-appellant.

Before MARKEY *, Chief Judge, and GEE and POLITZ, Circuit Judges.

MARKEY, Chief Judge:

CMI Corporation (CMI) appeals from a judgment of the United States District Court for the Southern District of Mississippi holding it liable to ViCon, Inc. (ViCon) for breach of contract, breach of warranty and tortious misrepresentation relating to the sale of a "hot mix" asphalt plant. CMI also appeals a denial of its motion under Rule 60(b) of the Federal Rules of Civil Procedure (FRCP) to vacate judgment and for a new trial. ViCon cross-appeals that portion of the judgment denying it recovery of interest on the judgment from the filing of the Master's Report. We affirm.

### Background

This diversity action arises out of the sale of a "hot mix" asphalt plant by CMI to ViCon. CMI is an Oklahoma corporation engaged in the manufacture of highway construction equipment. From 1969 until 1975, it also engaged in the manufacture of hot mix asphalt plants in Chattanooga, Tennessee. ViCon, a Louisiana corporation qualified to do business in Mississippi, is engaged in the asphalt construction business.

In May 1973, ViCon through its president, Victor Mann (Mann) began discussions in Chattanooga with CMI sales representatives Jones and Barksdale for the purchase of an asphalt plant. Those discussions culminated in a written contract dated June 1, 1973.

Under the contract, plant components were shipped from Chattanooga to ViCon's operations in Pearl River County, Mississippi, and assembled under the supervision of CMI's erection superintendent. The first shipment of components arrived on July 6, 1973 and CMI's erection superintendent began work July 16, 1973. The plant became operational on September 10, 1973.

ViCon experienced mechanical problems with various plant components. ViCon notified CMI of those problems and CMI attempted to correct them at little or no expense to ViCon until March 1, 1974, when CMI put ViCon on a C.O.D. basis for defective material replacements.

Hot mix asphalt is a mixture of rock, gravel, sand or the like (aggregate) and liquid asphaltic oil. The mixture is produced at 250°F to 300°F and is used in paving streets, highways and airport runways. In the production process, the aggregate is first dried and simultaneously heated to the desired temperature. The dried aggregate is then mixed with asphaltic oil and the mixture discharged onto a truck for transport to the paving location.

The CMI plant included a rotary dryer for drying and heating aggregate. Though CMI sales literature represented that this dryer would dry 184 to 244 tons per hour of aggregate with a 6 percent moisture content,[1] between September 10, 1973 and March 1977, when ViCon sold the plant, ViCon's average production rate was 145 tons per hour.

ViCon filed this action on January 15, 1975 charging CMI with breach of contract, breach of warranty and tortious misrepresentation.[2] ViCon alleged that CMI misrep-

---

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. That literature includes the following table which relates the efficiency of the dryer to the moisture content of the aggregate:

ESTIMATED DRYER CAPACITY

With exhaust fan operating at approximately 42,000 CFM, DGV 835 FPM. Temperature at fan 250°. 25% excess air and 5% scavenger air.

| Surface Moisture Content | 4% | 5% | 6% | 7% | 8% | 10% |
|---|---|---|---|---|---|---|
| Dryer Material Processing Flow Rate (In Tons Per Hour) * | 244 to 326 | 210 to 278 | 184 to 244 | 165 to 217 | 148 to 194 | 117 to 163 |

NOTE: The above capacities are based on surface moisture removal. Capacities will vary depending on the gradation of the aggregate, the amount of internal and external moisture, operating procedures and atmospheric conditions.

* Capacities based on 100 lb. cu. ft. material.

2. In view of our affirmance respecting misrepresentations, we need not discuss the claims

resented: (1) that the plant would produce 200 tons of asphalt per hour using aggregate of 6% moisture content; (2) that the plant would be free of serious defects; and (3) that repair costs would be low. ViCon also alleged that CMI breached its express warranties in each of those respects.

By agreement and pursuant to FRCP Rule 52, the case was referred to a special master. The Master filed his Report and Recommendation on November 2, 1978, recommending that CMI be held liable to ViCon on all three theories and that ViCon be awarded $1,034,337.20 in damages.

Judge Walter L. Nixon adopted the Master's Report on March 7, 1980 and entered judgment April 5, 1980 awarding the recommended amount to ViCon together with interest from the date of judgment.

CMI argues: (1) that the court's findings of fact are inadequate under Rule 52(a) and are clearly erroneous;[3] (2) that ViCon failed to prove misrepresentation; and (3) that the award and calculation of damages is clearly erroneous.

CMI also argues Judge Nixon erred in denying its motion to set aside the judgment and for a new trial on grounds of newly discovered evidence.[4] That evidence related to Mann's April 17, 1980 indictment on charges stemming from a ViCon contract to repave runways at New Orleans International Airport. Mann subsequently pleaded guilty to charges of conspiring to defraud the United States and of knowingly making false statements about ViCon's contract performance.

ViCon asserts that Judge Nixon erred in denying it interest from the date of the Master's Report.

*Issues*

The issues are (I) whether Judge Nixon's findings comply with Rule 52(a); (II) whether Judge Nixon erred in holding CMI liable for tortious misrepresentation; (III) whether the award and calculation of damages is clearly erroneous; (IV) whether Judge Nixon properly denied CMI's Rule 60(b) motion; and (V) whether ViCon is entitled to interest from the date of the Master's Report.

## OPINION

(I) *Findings of Fact under Rule 52(a).*

Regarding adequacy under Rule 52(a), CMI correctly says a court's findings "must be sufficiently detailed to give [the reviewing court] a clear understanding of the analytical process by which ultimate findings were reached and to assure [the reviewing court] that the trial court took care in ascertaining the facts." *Golf City Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 433 (5th Cir. 1977). This court has recognized, however, that that requirement is not rigid: "Courts need not indulge in exegetics, or parse or declaim every fact and each nuance and hypothesis." *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 518 (5th Cir. 1969). The test is whether findings are sufficiently comprehensive and pertinent to the issues to provide a basis for decision. *Id.* at 515.

■ In formulating his findings, the Master requested proposed findings of each of the parties, selected those he deemed

---

respecting breach of contract and breach of warranty.

**3.** Rule 52(a) provides in pertinent part:
Rule 52. Findings by the Court.
(a) Effect
  In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, .... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master,

to the extent that the court adopts them, shall be considered as the findings of the court.

**4.** Rule 60(b) provides in pertinent part:
  Mistake; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

correct and rejected those he deemed incorrect.[5] That the Master substantially accepted ViCon's proposed findings, and rejected CMI's, does not alone indicate that the Master failed to properly perform his judicial function.

While counsel may be disappointed that findings do not discuss propositions sincerely contended for, that, alone, does not make them inadequate or suggest that the propositions were not understood by the court. A decision, as between two contestants, necessarily rejects contentions made by one or the other.

*Schilling v. Schwitzer-Cummins Co.,* 142 F.2d 82, 84 (D.C.Cir.1944). To the contrary, review of the Master's Report and Judge Nixon's opinion establishes the presence of detailed findings of subsidiary facts sufficient to provide a basis for decision and review by this court. Hence CMI's attack on the adequacy of the findings must fail.

Similarly, CMI's assertion that the findings here are clearly erroneous is unfounded. Rule 52(a) provides that a master's findings, to the extent adopted by the district court, are to be considered findings of the court and are not to be set aside unless clearly erroneous. The question for the appellate court under Rule 52(a) is not whether it would have made the same findings, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed". *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 103, 123, 89 S.Ct. 1562, 1566, 1576 (1969).

Because the present findings are amply supported by the evidence, as discussed herein, we cannot agree that they are clearly erroneous.

(II) *Tortious Misrepresentation.*

A. Choice of Law

Judge Nixon, in finding that CMI was liable to ViCon on: (1) breach of contract, (2) breach of warranty, and (3) tortious misrepresentation, held that Tennessee law should govern all three theories. CMI agrees that Tennessee law should apply to (1) and (2) but contests its application to (3).

In resolving choice of law questions, federal courts must follow the conflicts of law rules of the forum state. *Klaxton Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this case, the forum state is Mississippi.

Mississippi has adopted the "center of gravity" test for resolving choice of law questions in tort actions. *Mitchell v. Craft,* 211 So.2d 509 (Miss.1968). Under that test, the forum court is required to apply the law of the place having "the most significant relationship to the events or parties, or which, because of the relationship or contact with the events and parties, has the greatest concern with the specific issues with respect to the liabilities and the rights of the parties to the litigation." *Craig v. Columbus Compress and Warehouse Co.,* 210 So.2d 645, 649 (Miss.1968).

CMI concedes that the center of gravity test should apply, but contends that it compels application of Mississippi's law on misrepresentation. We disagree.

In applying the center of gravity test in *Mitchell,* the court noted approvingly the principles set forth in the Restatement (Second) of Conflict of Laws. Regarding the tortious misrepresentation theory, Comment F to the Restatement (Second) Conflict of Laws, Section 145, states:

The principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities governing the misrepresentation claimed in the particular case.

Ample evidence of record supports Judge Nixon's finding that Tennessee has the

---

**5.** The better practice is to request proposed findings prior to decision and to make the request of counsel for both sides. In this way each party may present findings setting forth his theories and the evidence that he thinks supports those theories. The Court may select the findings that are correct and reject those that are wrong.

Wright & Miller, *Federal Practice and Procedure* § 2578, at 703.

most significant relationship to the parties and events in this litigation. It is undisputed that Jones and Barksdale were located in Tennessee; that the representations were made and received in Tennessee; that ViCon relied on those representations in Tennessee by deciding to purchase the plant, leaving with CMI a $10,000 downpayment; that delivery occurred in Tennessee[6]; and that ViCon directed all requests for parts and service to CMI personnel located in Tennessee.

The sole basis on which CMI urges application of Mississippi law is that state's role as the site of the forum and the plant. That circumstance cannot be taken as indicative of the center of gravity when compared with the facts listed by the district court. We hold therefore that Judge Nixon correctly applied Tennessee law to ViCon's misrepresentation claim.

## B. *Tennessee Law of Misrepresentation*

■ Tennessee first recognized the law of tortious misrepresentation in *Ford Motor Co. v. Lonon*, 217 Tenn. 400, 398 S.W.2d 240 (1966). There the court permitted Lonon to recover actual and consequential damages resulting from defects in a Ford tractor. Lonon had purchased the tractor from his local dealer, relying on representations made to him by the dealer, and in Ford advertising and sales literature, that the tractor would be trouble-free. In holding Ford liable for misrepresentation, the court applied Section 552d of the Restatement (Second) of Torts[7] which imposes liability on a seller of chattels who makes "misrepresentations of material facts concerning the character or quality of the chattel . . . of importance to the normal purchaser, by which the ultimate buyer may justifiably be expected to be influenced in buying the chattel." 398 S.W.2d at 247, quoting *Restatement (Second) of Torts,* § 402B, Comment (g).

### 1. *CMI's Representations*

#### (a) *Plant Production*

ViCon says CMI falsely represented, through its advertising literature (specifically its dryer specification sheet) and the oral representations of its salesmen, that its asphalt plant would produce 200 tons of asphalt per hour.

CMI denies making any misrepresentations concerning plant production capabilities and says that neither the dryer sheet nor its salesmen's oral representations establish the claimed misrepresentation. Because the dryer sheet refers only to dryer capacity not total production, CMI says ViCon's reliance thereon is misplaced. Assuming arguendo that the dryer sheet relates to total plant production, CMI says ViCon introduced no evidence that the dryer did not perform as represented.

It is undisputed that the plant achieved an average production rate of only 145 tons per hour. The Master found the average moisture content of the aggregate used to have been 6%, a level at which the dryer sheet states it will dry 184–244 tons per hour. That finding was based on two written reports of moisture tests conducted by an independent testing inspector showing: (1) a 6.47% moisture content on the day following a 1.16 inch rainfall and (2) a 4.94% moisture content, a month and a half later and on the inspector's deposition testimony that in numerous other unrecorded tests, the moisture content never exceeded 6%. Though CMI urges that the Master erred in relying on this testimony, its only attempt at rebuttal was through its own chief engineer who testified, based on his calculations of ViCon's average fuel consumption for one of its jobs over a 6 month period, that the average moisture content was 10%.

---

**6.** Under the contract, the plant was delivered f. o. b. Chattanooga, Tennessee.

**7.** § 552d provides:
   One engaged in the business of selling chattels who, by advertising, labels or otherwise, make to the public a misrepresentation of a material fact concerning the character or

quality of a chattel sold by him is subject to liability for pecuniary loss caused to another by his purchase of the chattel and justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

That testimony was subsequently discredited:

Q. So your ten percent moisture that you come up with is a result that you wanted to reach rather than what your own calculations showed it to be, isn't that correct?

A. That's right.

Moreover, CMI's own tests in November, 1973 showed an aggregate with a moisture content of 4.2%. CMI urges that asphalt production is a function of variables other than dryer efficiency, such as cycle time [8] and hauling efficiency,[9] but there is no evidence that those factors significantly affected the average hourly production rate of the plant. In fact, CMI states in its advertising literature that the drying process is at the heart of efficient asphalt production and that while all components of an asphalt plant affect its production, the most common bottleneck is dryer performance.

Regarding oral representations, CMI says that if Jones represented plant production to be 200 tons per hour, ViCon is not entitled to rely thereon because Mann knew that Jones was not aware of all the variables involved in ViCon's asphalt production. Again, CMI's difficulty lies in the absence from the record of evidence to support its position. To the contrary, CMI's own witnesses testified at trial that its general advertising is designed to create in prospective purchasers certain expectations regarding the product and that such purchasers have a right to rely on its representations.

Finally, CMI contends that because ViCon's records show that the plant did produce at a rate of 200 tons per hour on 15 of the 477 production days, approximately 3% of the time, the plant had that inherent capacity and its representation was therefore true. CMI's contention is disingenu-

ous. Judge Nixon found that CMI's production representations related to sustained rates of production, and that finding is amply supported by the evidence of record. That the plant operated at 200 tons per hour on 3% of its production days is no indication that the plant was capable of sustained performance at that rate. In fact, substantial evidence established that the plant was not capable of such sustained performance.

(b) *Maintenance and Repair Costs*

Judge Nixon also found that CMI had falsely represented that the plant would be free of serious defects and would have a low maintenance cost.

CMI does not deny that it made those representations or that ViCon suffered mechanical failures. Nor does CMI deny that those failures were attributable to defective material, except with respect to the wet wash exhaust system.[10] Instead, CMI maintains that because the maintenance costs were lower than the industry average, that error occurred in the finding that those expenses were excessive. We disagree.

ViCon's uncontroverted testimony establishes that it incurred expenses of $129,170.55 for parts and labor to correct defective conditions in the plant over and above its normal repair and maintenance costs. That figure clearly establishes the excessive cost of maintaining the plant.

Regarding the wet wash system, CMI says its premature wear is attributable to corrosion caused by ViCon's method of operation, not by any defect in the system itself. ViCon says the wear resulted from abrasion by an excessive number of fine sand particles (fines) being pulled through the system. In light of the extensive testi-

---

8. Cycle time is measured by the cumulative time required to feed the aggregate into the mixer; mix the aggregate with asphaltic oil; and to discharge the mixture from the mixer. Because the purchaser of the asphalt may specify the desired mixing time, cycle time may vary from job to job.

9. Because the mixing operation can be conducted only when a truck is in position to

receive the hot mix, the efficiency of the mixing operation is controlled by the combination of cycle time and the movement of trucks into and out of loading position, i. e., the hauling efficiency.

10. The wet wash system is a pollution control device used to remove solid particles from the dryer exhaust.

mony on the subject, Judge Nixon's finding that both factors contributed to wear, but that the primary cause was abrasion, cannot be held clearly erroneous. ViCon's engineering expert testified without contradiction that excessive fines were present in the system. Moreover, CMI admitted that during the early stages of the plant's operation, excessive dust was carried through the exhaust system.

Judge Nixon properly found that CMI falsely represented the plant's production capability and its maintenance and repair costs. Because those representations are clearly material to prospective purchasers of hot mix asphalt plants and of such character as to influence a purchase of such plants, we conclude, as did Judge Nixon, that each of the elements of tortious misrepresentation is present and that ViCon is entitled to recover thereon.

### 2. *Warranty Disclaimer*

■ That the CMI/ViCon contract contains a disclaimer of express or implied warranties does not absolve CMI of liability for tortious misrepresentation. Under Tennessee law, it is clear that in a tortious misrepresentation action under § 552d, "disclaimers of liability by the supplier are ineffectual to defeat recovery." *Walker Truck Contractors v. Crane Courier Co.*, 405 F.Supp. 911, 917 (E.D.Tenn.1975).

### 3. *The Parol Evidence Rule*

■ Nor is the parol evidence rule violated by consideration of the representations made by CMI. Evidence of misrepresentations may be admitted without violating the rule where, as here, they neither tend to vary nor contradict the written contract. As set forth by the Tennessee Court of Appeals in *Huddleston v. Lee*, 39 Tenn.App. 465, 284 S.W.2d 705 (1955)

> The rule applies only against attempts by parol to vary or contradict a written contract or to say it was different, in order to hold the seller on a promise or contract obligation not in the writing or contradictory of the writing. It does not apply where the effort is not to change the

contract but to hold the seller for a tort, that is a false warranty or a false affirmation of fact, which was not part of the contract but was the inducement to it. *Id.* at 710.

### (III) *Damages.*

■ Because Tennessee law permits a buyer to recover both actual and consequential damages resulting from a seller's misrepresentations, Judge Nixon properly awarded ViCon consequential damages for "economic loss" resulting from the failure of the plant to perform as represented. *Ford Motor Co. v. Lonon*, supra. Though CMI admits that such damages are recoverable under Section 552d, it objects to the findings on the amount of those damages.

The Master found that the failure of the plant to produce 200 tons per hour increased production costs per ton and accordingly recommended that ViCon be awarded damages for production loss. CMI complains that the evidence of production loss is too speculative to support the award and that ViCon failed to show that it could have produced and utilized the increased production without increased costs. We disagree.

The court's assessment of damages is amply supported by the uncontradicted testimony of Frank Betts, a qualified CPA, who examined ViCon's financial records and testified that its major production costs remained constant regardless of plant production. Because less production means a lesser base on which to distribute fixed costs of operation, Betts concluded that ViCon suffered monetary loss reflected in increased production costs per ton when the plant averaged 145 tons per hour.

Because the plant produced 27.5% less asphalt than CMI said it would, the district court computed ViCon's loss by multiplying its fixed costs by 27.5%. Contrary to CMI's contentions, that assessment is founded on a reasonable factual basis and is not speculative. Nor is it appropriate that we substitute our judgment for that of a district court respecting the level or amount of damages where, as here, a basis for the assessment appears in the record. The award is accordingly affirmed.

**(IV)** *Rule 60(b) Motion.*

■ CMI says that because Mann's uncorroborated testimony provided the only proof of essential elements of ViCon's case, evidence that Mann later pleaded guilty to charges of misrepresenting ViCon's performance under a government contract, a fraud against the United States, would have produced a different result in this case. CMI says that substantial justice therefore requires that it be granted relief under Rule 60(b). We disagree.

Mann's indictment and guilty plea relate to events occurring after he testified in this case and are unrelated to this lawsuit. Though CMI urges that the evidence goes to Mann's credibility as a witness, CMI neither asserts here nor did it assert below that Mann committed perjury in this case.

Mann's testimony in this case is consistent with that of other ViCon witnesses as well as that of CMI's own witnesses and its factual accuracy is not disputed by CMI. In such circumstances, Judge Nixon properly concluded that the evidence that Mann made misrepresentations in a different proceeding would not have produced a different result in this case and that substantial justice was in fact achieved here by his judgment. The denial of the Rule 60(b) motion was not an abuse of discretion and must therefore be affirmed.

**(V)** *Interest.*

■ 28 U.S.C. § 1961 makes mandatory the allowance of interest at the rate provided by state law from the date of entry of the district court judgment. Whether the judgment will also include prejudgment interest is a question of the measure of damages and is to be resolved by state law.

Relying on *Air Temperature Inc. v. Morris*, 63 Tenn.App. 90, 469 S.W.2d 495 (Tenn. Ct.App.1970), ViCon says that under Tennessee law, interest accrues as a matter of right from the time an obligation is liquidated. ViCon then says that because its damages became liquidated as of the filing of the Master's Report, it is entitled to interest from that date.

ViCon's reliance on *Air Temperature* is misplaced. The court there expressly noted:

> Interest as a matter of right is purely statutory, unknown to the common law, and its allowance must be confined to those obligations and demands specified and enumerated in statutory provisions. In cases not so included, it remains as in common law, a matter of discretion in the [court], to be allowed or not, according to the facts presented.

Id. at 504.

Though prejudgment interest was allowed in *Air Temperature*, that award was based on the court's recognition of the debtor-creditor relationship of the parties and its application of Tennessee Code § 47–14–107:

> All bonds, notes, bills of exchange and liquidated and settled accounts signed by the debtor shall bear interest from the time they become due . . . .

Because ViCon asserts no statutory basis for claiming interest from the filing of the Master's Report, the award of such interest is left to the discretion of the district court. Judge Nixon's refusal to award prejudgment interest was not, in the circumstances of this case, an abuse of discretion and is therefore affirmed.

*Conclusion*

The findings conform to the requirements of Rule 52(a) and are amply supported by evidence of record.

Because Tennessee had the most significant contacts with the events and parties in this litigation, Tennessee law was properly applied to ViCon's misrepresentation claim. Application of that law requires that CMI be held liable to ViCon for tortious misrepresentation.

Judge Nixon correctly awarded actual and consequential damages to ViCon on its misrepresentation claim. That award was founded on a reasonable basis of fact and was not speculative.

Neither the denial of CMI's Rule 60(b) motion nor the refusal to award interest

from the date of the Master's Report constituted an abuse of discretion.

Accordingly, the judgment appealed from is AFFIRMED.