COASTAL (BERMUDA) LTD., Plaintiff-Appellee Cross-Appellant,

v.

E.W. SAYBOLT & CO., INC., Defendant-Appellant, Cross-Appellee.

No. 86–3489.

United States Court of Appeals, Fifth Circuit.

Sept. 11, 1987.

Rehearing Denied Oct. 27, 1987.

Francis A. Courtnay, Jr., A. Gill Dyer, Julianne Owens, Courtenay, Forstall, Grace & Hebert, New Orleans, La., for defendant-appellant, cross-appellee.

Terriberry, Carroll & Yancey, M.D. Yager, New Orleans, La., for Equity Shipping Corp.

Robert M. Contois, Jr., New Orleans, La., for Coastal.

Before WRIGHT,[*] GEE and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this action Coastal (Bermuda) Ltd. ("Coastal"), a dissatisfied purchaser of 60,-000 metric tons of "No. 6" fuel oil, filed suit against the independent surveyor of the oil cargo, E. W. Saybolt & Co., Inc. ("Saybolt"), seeking damages based on tort and contract theories. Following a one day bench trial, the district court rejected Coastal's contract theory, but held that under Section 552 of the *Restatement (Second) of Torts*, Saybolt was liable for supplying false information upon which others relied in a business transaction. More specifically, the district court held that Saybolt negligently failed to disclose on a laboratory analysis report of the oil cargo that the single set of test results represented a composite sample of the various tanks of oil sold to Coastal. Finding no negligence on the part of Saybolt in the performance of its analyses, nor in the preparation or communication of its test reports, and, further, finding no reliance by Coastal on the specific wording of the report at issue, we reverse.

I

This saga began in December 1981 when the M/T HALKI, a vessel owned by Equity Shipping Corporation ("Equity"), arrived at the Mississippi River oil processing refinery of GHR Energy Corporation ("GHR"). GHR, who had chartered the HALKI from Equity, loaded the vessel with residual fuel oil from five separate storage tanks at the GHR terminal. The oil had been processed in different units at the GHR refinery. The fuel oil, designated as "No. 6 oil"[1] by GHR, had been purchased by Armada

---

1. In its bench opinion, the district court described No. 6 oil as follows:

No. 6 fuel oil is best characterized as the residual material of the refining process, which drive off or separate the lighter materials and middle distillate fuels, which can be

Transport and Refining Company, Ltd. ("Armada") and was destined for Amsterdam, Holland. GHR hired Saybolt, a cargo inspection company that regularly worked for GHR, to determine the amount of oil loaded onto the vessel and to perform quality analyses on oil samples before, during and after the loading. Saybolt drew and analyzed four separate preloading samples, in accord with GHR's instructions. Two samples were taken from shoretanks numbered 150–17 and 150–20; and two were taken from barges Nos. TT7006 and TT7007. Of the four samples taken, three produced results which fell outside the acceptable range for No. 6 fuel oil specifica-

> removed from crude. It is nearly, literally, the bottom of the barrel, and in the industry known as "dirty oil."
>
> No. 6 oil can vary significantly in such characteristics as viscosity, which is one of its most important characteristics, specific gravity, pourpoint and levels of heavy metals or other contaminants. It is also unrefuted here that No. 6 oil derived from crude stock, which is basically paraffinic, is potentially incompatible with No. 6 oil derived from what is characterized as aromatic crude....
>
> The incompatibility is most usually manifested by the creation or precipitation of what are called "asphaltines" when the lots are mixed, creating an undesired firmness in the commodity.

Record, Vol. VII at 4–5.

2. The preloading laboratory analysis reports, Plaintiff's Exhibits Nos. 33–35, provide in pertinent part:

Plaintiff's Exhibit No. 33:

Laboratory Analysis Report

Sample designated by client as No. 6 Fuel Oil

From   Sampled from: TK 150–17 B/4 Load M/T HALKI
       Date Sampled: 12/9/81

For     Goodhope Refineries, Inc.

Tests:*

. . .

Viscosity, S.F. at 122 DEG F       188.8 SECS

. . .

Plaintiff's Exhibit No. 34:

Laboratory Analysis Report

Sample designated by client as No. 6 Fuel Oil

From   Sampled from: TK 150–20 B/4 Load M/T HALKI
       Date Sampled: 12/9/81

For     Goodhope Refineries, Inc.

Tests:*

. . .

Viscosity, S.F. at 122 DEG F       435 SECS.

. . .

tions.[2] Also in accord with GHR's orders, Saybolt performed a "final ship" or composite sample of the total oil cargo loaded on the HALKI. This final sample, performed according to industry practice, was taken by hand blending samples from each tank of oil on the HALKI and weighting them according to the amount of oil in each tank. The results yielded an oil viscosity of 252 seconds on the Saybolt Furol Scale at 122° Fahrenheit.[3] This result was within the acceptable American Society for Testing Materials ("A.S.T.M.") standard range for No. 6 oil.[4]

While the tanker plied toward Amsterdam, Armada sold the cargo of No. 6 fuel

Plaintiff's Exhibit No. 35:

Laboratory Analysis Report

Sample designated by client as No. 6 Fuel Oil

From   Sampled from: IT 7007 & 7006 B/4 LD. HALKI
      Date sampled: 12/9/81

For     Goodhope Refineries, Inc.

Tests:*

. . .

| | TT7007 | TT7006 |
|---|---|---|
| Viscosity, S.F. at 122 DEG F | 317 SECS. | 330 SECS. |

. . .

\* Although the reports list ten different test results, we have only reproduced those for viscosity on the Saybolt Furol scale.

3. The final ship sample, Plaintiff's Exhibit No. 16, provides in pertinent part:

Laboratory Analysis Report

Sample designated by client as No. 6 Fuel Oil

From   Sampled from: M/T HALKI at
      AMA Anchorage Final Ship

For     Goodhope Refinery, Inc.

Tests:

| | |
|---|---|
| Gravity API at 60 F | 10.0 |
| Flash Point (PMCC) | 172 F |
| Viscosity, S.U. at 100 F | 6,969 SECS |
| Viscosity, KIN at 100 C | 38.1 SECS |
| Viscosity, S.F. at 122 F | 252 SECS |
| Viscosity, KIN at 50 C | 535.4 CTS |
| Pour Point | 35 F |
| Water by Distillation | 0.4% |
| Sediment by Extraction | 0.26% |
| Sulfur (D1552) | 2.50% |
| Ash | 0.14% |
| Vanadium | 373 PPM |
| Asphaltenes | 10.6% |

4. According to the testimony of Saybolt's chemist, Mr. Babin, the A.S.T.M. standard viscosity range for No. 6 fuel oil is a minimum of 45 seconds and a maximum of 300 seconds at 50°

oil to Coastal. A Coastal oil trader in London, David Robinson, negotiated the purchase with a Paris broker. Robinson asked the broker about the nature of the cargo, the specifications, the HALKI's estimated time of arrival, and the cargo's size. Because Coastal required an independent analysis of all oil cargoes prior to purchase, Robinson inquired which inspection company had performed the oil analyses. The broker informed him that Saybolt had performed the tests. Robinson's superior, Mr. Bowman, concluded the deal by telephone with the Paris broker later that afternoon. The broker sent Coastal a confirmation Telex, which stated that Saybolt's analysis was final and binding to the buyer and the seller. Neither Robinson nor Bowman saw copies of any Saybolt test report during the negotiations. Neither asked nor was told whether the report stated that the test was "composite."

Upon arrival in Amsterdam, the fuel oil was too cold to discharge or even to test.[5] It required twelve days of heating the vessel's holds before the oil could be discharged into four shoretanks (Nos. 201, 202, 811 and 813). Saybolt-van Duyn, a related corporation of the defendant, tested the oil after discharge, and its results were comparable to those obtained by Saybolt upon loading. Approximately 340 cubic meters of oil could not be discharged and remained on board the HALKI. Coastal originally refused the shipment, complaining of the oil's high viscosity and excess water. The dispute was submitted to arbitration, and by a court order of the Southern District of New York, GHR, Equity, Armada and Coastal were compelled to participate in the arbitration proceedings. In January 1983, GHR filed a Chapter 11 petition in bankruptcy, which stayed all arbitration.

On June 10, 1983, Coastal filed suit against Saybolt in the United States District Court for the Eastern District of Louisiana, alleging in its original complaint that Saybolt had breached a contract with Armada to survey and analyze the fuel oil. Coastal claimed that Saybolt had issued materially erroneous reports of its test results knowing that subsequent purchasers of the oil cargo would rely on these reports. Coastal sought damages from Saybolt on the theory that it was a third-party beneficiary of the alleged Armada-Saybolt contract. Saybolt then filed a third-party claim *in rem* against the HALKI and its owner, Equity, and tendered those parties to Coastal as additional defendants, pursuant to Fed.R.Civ.P. 14(c).

The district court, *sua sponte*, stayed Coastal's suit pending the outcome of the New York arbitration proceedings, to which Saybolt was not a party. Coastal appealed the stay, and this court dismissed the appeal for lack of jurisdiction on the ground that stays in admiralty are nonappealable interlocutory orders. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 200 (5th Cir.1985).

The district court then modified its stay order and permitted Coastal's claim against Saybolt, but not Equity, to proceed. A bench trial was held on May 29, 1986, and the court awarded judgment for Coastal in the amount of $521,847.27 plus costs and interest from the date of judgment.

Saybolt noticed an appeal before any posttrial motions were filed. On June 11, 1986, Coastal moved to amend the judgment to add prejudgment interest and also moved for entry of final judgment. The district court denied Coastal's motion to amend, but entered final judgment in favor of Coastal on July 17, 1986. The district court then denied Saybolt's motion for a new trial, and Saybolt filed its second notice of appeal. Coastal appealed the district court's denial of its motion for prejudgment interest.

## II

Coastal presented two theories of liability before the district court: one in contract

---

Centigrade or 122° Fahrenheit as measured on the Saybolt Furol scale.

**5.** It is alleged that damage to the cargo was caused by deficiencies in the HALKI's heating coils. This issue was a subject of the arbitration proceedings between GHR, Equity, Armada and Coastal and was not an issue resolved by the district court in this action.

and a second in tort. With respect to Coastal's third-party beneficiary contract theory, the district court held that the "plaintiff has not carried its burden of proof." [6]

However, the district court found that Coastal had stated a valid cause of action in tort, based on section 552 of the *Restatement (Second) of Torts*.[7] Citing *Vicon, Inc. v. CMI Corp.*, 657 F.2d 768 (5th Cir. 1981), and *Royal Embassy v. Ioannis Martinos*, 1986 A.M.C. 769 (E.D.N.C.1984), the district court held that

> a firm which in the course of its business provides information for the guidance of others in business transactions is responsible for damage caused by reliance upon that information, if the firm fails to exercise the care and competence in obtaining and communicating the information which the recipient is justified in expecting, and if the harm is suffered by a person for whose guidance or upon whose reliance the information was supplied or could be expected. That is clearly the situation which confronts the defendant in this case.

Record, Vol. VII at 15–16.

The district court concluded that Saybolt was negligent because the words "composite sample" did not appear on Saybolt's final ship test report. *See supra* note 3. Coastal had argued to the district court that without the word "composite," the test report indicated that each tank on the HALKI contained uniformly blended No. 6 oil with the exact specifications described in Saybolt's final ship report. The district court accepted Coastal's argument and held that absent the word "composite" or, at least, a range of minimum and maximum values for the properties analyzed, Saybolt's report failed to accurately describe the cargo, which was unblended, nonuniform lots of oil, some of which did not meet the minimum specifications for No. 6 fuel oil.[8]

While there is no argument that the test report in question (Plaintiff's Exhibit No. 16) did not contain the word "composite," Saybolt contends that the report was nonetheless marked "final ship," which indicated to GHR and to other persons in the industry that the sample had been taken after the ship was loaded and was a composite sample of the oil in all the ship's tanks.

■ In order to state a cause of action for negligent misrepresentation under section 552 of the *Restatement (Second)*, the plaintiff must allege that: (1) the defendant, in the course of its profession, supplied false information for the plaintiff's guidance in a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the plaintiff relied on the false information in a

---

6. Coastal's breach of contract claim falls with our holding in this opinion. Coastal has argued that it was the intended beneficiary of Saybolt's contract to analyze and report the properties of the oil cargo. Because our opinion explicitly holds that Saybolt's report did not misrepresent the quality of the oil, there is no basis for Coastal's breach of contract claim.

7. Section 552 provides:
   Information Negligently Supplied for the Guidance of Others
   (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
   (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
   (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
   *Restatement (Second) of Torts* § 552 (1977).

8. At oral argument Judge Gee described Coastal's dilemma as similar to receiving some axle grease and some lighter fluid that, when mixed together, might look like motor oil.

transaction that the defendant intended the information to influence; and (4) the plaintiff thereby suffered pecuniary loss. *Grass v. Credito Mexicano, S.A.*, 797 F.2d 220 (5th Cir.1986). Because we find no evidence in the record that Saybolt supplied false information for Coastal's guidance in this business transaction, no evidence that Saybolt failed to exercise reasonable care in obtaining or communicating the test results, and no evidence that Coastal justifiably relied on Saybolt's final ship report when it interpreted the report to indicate a preblended, uniform cargo of No. 6 oil, we reverse the district court's holding.

### III

Our review of the record reveals that Coastal has failed to show the elements required in a prima facie case of negligent misrepresentation. We discuss below the record evidence in connection with each element.

### A.

■ Coastal must first show that the information in Saybolt's test report was false. The disputed test report, Plaintiff's Exhibit No. 16, is headed:

Sampled from: M/T HALKI at AMA ANCHORAGE FINAL SHIP

The report goes on to list the tests performed on the oil and the results, which include a viscosity of 252 seconds on the Saybolt Furol scale at 122° Fahrenheit.

*See supra* note 3. The record shows that this result falls within the A.S.T.M. standard viscosity range for No. 6 oil.

The district court found the testimony of Mr. Ralph Babin, a Saybolt chemist, particularly credible. In its ruling from the bench, the district court stated:

Mr. Babin testified that the test was a certification to the world. He testified that the report failed to indicate that the test results were composite only. Mr. Brossette, another witness brought on by the defendant, confirmed Mr. Babin's and confirmed the implication of Mr. Babin's testimony when he admitted that the description in the test report was an exact description rather than a composite or a minimum/maximum description of the commodity in question. Mr. Babin said that the failure to indicate that the test results were a composite only [,] constituted an omission in direct response to a request from the court.[9]

Record, Vol. VII at 8.

Although the district court found the information in Saybolt's report falsely represented the cargo because it did not include the word "composite" or, at least, indicate the maximum/minimum ranges for the tests performed, we must disagree. The record shows that GHR instructed Saybolt to "make up a composite sample of that ship and determine what the composite sample's parameters were." *Id.,* Vol. VI at 57. According to Babin, the witness whom the district court found most credible, Say-

9. During the bench trial, the district court questioned Babin as follows:

THE COURT: I'm sorry to have to interrupt you, but this is a new universe for me. So I'm trying to understand what happens.

Mr. Babin, please understand, sir, I'm not picking on you. This is an extremely technical problem, and if I'm to decide it fairly I need to know all I can know. Sometimes counsel can't know the questions that I have in my mind, and rather than wait I would just as soon ask so I know I won't forget to ask a question.

On your report you show a viscosity at 122 degrees Fahrenheit of 252 seconds and yet I've heard testimony about varying ranges of viscosity all the way up to 435 and as low, I believe, as 188. Now, does 252 seconds represent some kind of composite or average?

THE WITNESS: Yes, average.

THE COURT: And so how would someone know that 252 was a composite or an average

measure of viscosity as opposed to an actual measure looking at this report?

THE WITNESS: If you will notice up at the top of the report, it says Sample from the M/T HALKI at Ama Anchorage, Final Ship.

THE COURT: What does that say in regular terms that would tell me that I should know then that that 252 seconds represents a composite or an average measure of viscosity? Why does that tell me that?

THE WITNESS: Well, according to our instructions from our client, it was to make a composite sample and issue a report on that.

THE COURT: Where on this report does it say that your sample was a composite sample?

THE WITNESS: It doesn't say it. That was an omission.

THE COURT: It was an omission?

THE WITNESS: Yes.

THE COURT: I'm sorry.... Go ahead.

Record, Vol. VI at 59–60.

bolt's final ship report was an accurate description of the average parameter of the oil as it came from the ship. *Id.* at 56. Babin further testified that the reports issued by Saybolt made it clear that the oil cargo contained in the four separate tanks on the HALKI was not uniform, but came from a wide variety of sources. *Id.* at 55. Babin explained that lack of uniformity is not an unusual problem with No. 6 oil, and he commented "that's why we were so careful with our composite because we knew that the substance in each tank would probably vary." *Id.*

In its bench opinion, the district court emphasized Babin's statement that the failure to indicate "composite" on the test results constituted an omission. From our review of the record, however, Babin testified that "final ship" at the top of Saybolt's report indicated a composite sample. *Id.* at 59–60. While it is true that in response to recurrent questioning by the district court Babin stated that the absence of the word "composite" was an "omission," the substance of his testimony is nonetheless clear: Saybolt's report accurately described the final ship's cargo in accord with GHR's instructions.

Saybolt called Robert Bartell as a witness, the former manager of quantity control at GHR's refinery in Goodhope. Although the district court found the "general thrust of Mr. Bartell's testimony ... not credible," Bartell, like Babin, testified that the words "final ship" on Saybolt's report indicated to him that the sample was a composite.[10]

Saybolt's final witness, Victor Brossette, was an expert in the field of petroleum products trading. Brossette testified, as did Babin and Bartell, that notwithstanding the lack of the word "composite," he would interpret Saybolt's test report to be a composite sample. Although the trial transcript shows that Brossette's testimony was not the essence of clarity, which appears at least partially attributable to the district court's interruptive questioning of the witness, Brossette nonetheless plainly stated: "Because it says 'final ship' and the way I know that ships are sampled, I would make the determination that this is the quality of the composite." *Id.* at 213.[11] Brossette testified that the better business practice would be to state a range of mini-

**10.** Bartell testified as follows:

Q I refer you to Plaintiff's Exhibit No. 16, which is the chemical analysis. What is that document, sir?

A This document is the result of the final ship sample after loading at Ama Anchorage of the Motor Vessel HALKI.

Q Is that a report of a test based on a test composite sample that you requested?

A Yes.

Q When you see that document as written, would that give you the impression it was the result of the test of the composite sample?

A Yes, sir. It's normal practice that a final ship sample is made up of a composite of the entire ship.

Q Is that the way you operate over there?

A Yes. That's the way we operate even at Valero, and *other people that I know of in the industry operate the same.*

Record, Vol. VI at 166–67 (emphasis added).

**11.** Brossette testified in pertinent part:

Q Referring to ... Plaintiff Exhibit No. 16, if you had received such a document in your business, what would you have assumed that document was telling you sir?

A That this is a composite sample. I can't assume it is a composite sample because it doesn't say composite, but I would assume

this would be the quality of the fuel oil that was loaded aboard the vessel.

Q So you wouldn't assume that it was a composite sample?

THE COURT: That's what he said,.... He said he cannot assume it's a composite sample because it didn't say, that.

THE WITNESS: *No, but it says it's the final ship sample.*

[COUNSEL]:

Q What does that mean to you?

A *I would take that to mean that this was the final composite of the ship.* It doesn't say that. I would take it to mean that.

Q Why would you say that?

A Because it says final ship and the way I know that ships are sampled I would make the determination that this is the quality of the composite.

THE COURT: Mr. Brossette, first you said that the description of the goods was a typical description between a buyer and a seller.

THE WITNESS: Yes, sir.

THE COURT: Then you retracted that and said it's not typical because it doesn't give minimums and maximums, it gives an exact description. Then a minute ago, in response to a question of [counsel], you said you cannot assume that it's a composite sample because the test doesn't, say so. Now you're

mums and maximums with respect to the specifications. He nonetheless unequivocally concluded that the Saybolt test report was a composite sample of the final, fully loaded ship. *Id.* at 213–14. We therefore interpret his testimony, as well as the testimony of other witnesses who examined the report, to demonstrate that because the words "final ship" clearly appeared on the report, the omission of the word "composite" did not render the report false as to the quality of the shipment. Coastal offered no witnesses who testified that the final ship report could be interpreted as false.[12] To be sure, it is most difficult for us to imagine how a person in the industry who knows that cargo vessels contain numerous tanks, would possibly read a *final* ship's report to mean anything but a composite sample drawn from all the vessel's tanks.

It is our conclusion after carefully reviewing all the evidence presented that Saybolt reported the test results and performed its responsibilities in accord with industry practice. There is no evidence to

> saying that final ship sample to you means a composite sample. Now, what is your testimony?
>
> THE WITNESS: Yes, sir. My testimony is that final ship sample, as the way I interpret it, is a composite of the ship. The fact that it doesn't say that doesn't mean that I wouldn't determine it to mean that.
>
> ....
>
> THE COURT: I know you've now said that final ship means composite sample.
>
> THE WITNESS: That's what I've interpreted.
>
> THE COURT: Those words don't mean anything to me, so I'm trying to understand why the words "final ship" mean composite sample to you.
>
> THE WITNESS: Okay. It means composite sample to me because—
>
> THE COURT: Take your time. I know I'm an imposing looking person, but my bite is a little worse than my bark.
>
> THE WITNESS: Final ship, to me, means that the analysis represents the quality of the oil on board the ship after it was completely loaded.
>
> Record, Vol. VI at 212–220 (emphasis added).
>
> The district court frequently examined the witnesses during this trial. Indeed, the judge appeared to have carried on much of the crucial questioning of the witnesses. While we in no way discourage a court's probing of a witness, particularly in a highly technical area such as

show that Saybolt supplied false information for GHR's guidance in this particular business transaction, nor did Saybolt supply false information to subsequent purchasers. All the evidence indicates is that even without the word "composite" printed on the test report, a reasonable business person in the industry would assume that Saybolt's single data specifications, which were clearly marked "final ship," were the results of a composite sample representing the entire cargo. Thus Coastal failed to prove the first element of its prima facie case. Implicit in this finding is a conclusion that Saybolt cannot be charged with culpable negligence in the way it reported or communicated the quality of the cargo, the second element required to make a prima facie case under § 552 of the *Restatement (Second) of Torts*. We turn, therefore, to examine Coastal's reliance on the report when it purchased the cargo.

### B.

■ Citing Babin's testimony, the district court found:

> that presented in this case, there is always the possibility that if a judge assumes the dual role of examining the witnesses and deciding the case, the judge might form a subjective view of the controversy that guides the direction of the questions, which may lead to an erroneous decision.

**12.** Coastal did offer the testimony of their oil trader, David Robinson, *see* discussion Part IV B, *supra*, who stated that based on his conversations during the negotiations, the confirmation Telex (which reproduced only the test results from Saybolt's final ship report), and his experience in the industry, he understood that each tank of the HALKI contained uniformly blended No. 6 oil with the exact specifications indicated by Saybolt's test results. Record, Vol. VI at 120–21. On this record, however, there is no evidence to show that the lack of minimum/maximum ranges on a final ship test report states to persons in the industry that a cargo is uniformly blended before loading; at most it would seem to be the basis for further inquiry on the part of the purchaser. In short, although the evidence suggests that the better business practice would be to report a range of minimum/maximum specifications for a composite sample, and although Saybolt's test report might have been clearer, nothing in the record shows that the single data specifications falsely represented the quality of the oil aboard the tanker.

Saybolt knew that GHR's oil moved all over the world. [Babin] testified that GHR wanted the test in question so that figures could not be doubted by the ultimate purchaser of the commodity, an implicit recognition that Saybolt knew others other than GHR might, in the chain of transaction, be relying on the test report.

*Id.*, Vol. VII at 7.

Although we agree with the district court that an independent tester such as Saybolt must reasonably expect subsequent purchasers of fuel oil to rely on its test reports, we find nothing in the record to show that Coastal's reliance on Saybolt's report is the source or cause of Coastal's misunderstanding about the composition of the cargo.

We now examine the testimony of David Robinson, Coastal's oil trader who negotiated the sale of oil from Armada through a Parisian broker. In his telephone conversation with the broker, Robinson asked about "the nature of the cargo, the specifications, its ETA, [and] size of the cargo." *Id.*, Vol. VI at 115. Robinson also asked which inspection company had performed the analyses, and he was informed that Saybolt had tested the oil cargo. Robinson further testified that he was interested in the cargo because it met the specifications and size that he was seeking for Coastal's inventory in Amsterdam. Robinson, who was completing a training period with Coastal, then informed his superior, Mr. Bowman, about the possible deal with Armada. Bowman, who did not testify at trial, made the final decision to purchase the HALKI oil. Both Bowman and Robinson spoke with the broker later that afternoon and confirmed the sale. The broker sent a confirmation Telex to Coastal in which only the test results of Saybolt's final ship report were reproduced and described as "final and binding" to the buyer and the seller. *Id.* at 119. The record does not reflect that Robinson ever asked the broker whether Saybolt's test results represented a composite sample or a uniformly blended cargo. Apart from Robinson's testimony regarding the negotiations, there is no evidence in the record that establishes what Bowman and the broker said, or what representations the broker might have made. Notwithstanding his lack of inquiry, Robinson assumed that the cargo was "uniform," that is, uniformly composed throughout each tank on the vessel of the exact No. 6 specifications indicated on Saybolt's final ship sample. *Id.* at 121. We must therefore conclude that whatever the source of Robinson's independent assumption that the cargo was uniform or preblended, it did not result from false representations made by Saybolt.

### C.

■ Finally, the evidence on damages also appears uncertain.[13] The district court awarded total damages of $521,847.27 plus interest and all costs in favor of Coastal. This figure was comprised of: (1) $49,-174.84 attributable to the 338.3 cubic meters of unpumpable oil left on board the HALKI, calculated at the contract price of $145.25 per metric ton; and (2) $472,671.43 for Coastal's costs in blending two shore-tanks (Nos. 201 and 813) that contained seventy-five percent of the HALKI cargo. Coastal purchased 2,821.919 metric tons of middle distillate oil ("MDO"), a high quality oil priced at $312.75 per metric ton, and blended it with the two shoretanks. The district court reasoned that this reduced the value of the MDO to that of No. 6 oil and awarded damages on that basis. Using the contract price of $145.25 per metric ton as the value of No. 6 oil, the district court calculated the net loss of the MDO as $472,671.43 (2,821.919 metric tons × [$312.75 − 145.25] ).

Contrary to the district court, we find that Coastal has not established its damages on this record. First, it appears that

---

**13.** Damages, of course, are appropriate only if the misrepresentation is the legal cause of the plaintiff's pecuniary loss. *Restatement (Second) of Torts* § 552B(1) (1977). As discussed *infra,* we have found on this record no misrepresenta- tion on the part of Saybolt. We nonetheless address the issue of damages in the context of Coastal's failure to establish the four elements of its prima facie case.

the district court erred in assessing liability against Saybolt for the 338.3 cubic meters of unpumpable oil remaining on the HALKI. The district court rejected as mere speculation Saybolt's argument that the oil solidified because the HALKI's heating system failed en route, or alternatively, because of high winds or heavy seas. Coastal, on the other hand, argued that the only reasonable inference from the evidence presented was that the oil cargo, composed of incompatible aromatic and paraffinic stocks, stratified in the ship's tank leaving a heavy "unpumpable sludge." Coastal maintained that the lost 338.3 cubic meters of cargo was attributable to the incompatible characteristics of the oil, which Saybolt negligently failed to describe on its test report. The district court made no specific finding of fact on why the oil was unpumpable. The court commented, however, in its bench opinion that "for whatever reason, [the oil] couldn't be pumped off." *Id.*, Vol. VII at 11.

We find Coastal's theory regarding the unpumpable sludge at least as speculative, and arguably more speculative, than that presented by Saybolt. We first note that there is no evidence in this record to prove that incompatible paraffinic oil stock was loaded on the HALKI. In fact, Babin testified that he considered the HALKI cargo to be compatible.[14] Furthermore, GHR never asked Saybolt to test the oil for compatibility or potential stratification. *Id.*, Vol. VI at 85–86. We therefore hold that Saybolt had no duty to perform additional tests for which GHR made no request and did not pay, and that liability for the unpumpable 338.3 cubic meters of oil remaining on the HALKI cannot be attributed to Saybolt.

Second, Robinson testified that Coastal purchased the oil on the HALKI fully intending to blend it upon discharge. According to Robinson, even if the oil had been uniform with the same viscosity of 252 seconds Saybolt Furol throughout the cargo, this viscosity was too high for the

European market, which demanded a viscosity of 3,500 to 4,500 on the Redwood 1 standard. We note, however, a silence in the record with regard to the blending costs that Coastal had originally anticipated. In addition, approximately twenty-five percent of the oil purchased (Tanks Nos. 202 and 811) was of much higher quality than the oil for which Coastal had bargained, and was within the European market viscosity range for No. 6 oil. Nothing in the record, however, indicates the value of this higher quality oil on the European market.

Furthermore, there is no evidence of either the quality or the value of the remaining two shoretanks of oil (Tanks Nos. 201 and 813) after the MDO was blended into them. This leaves the question whether the blended oil was of a higher quality than the usual No. 6 oil. If the blended oil were of superior quality, the full cost of the MDO was an incorrect damage award. What Coastal ultimately did with the blended oil, whether it was sold or added to Coastal's own inventory, is yet another fact that is absent from this record. We find nothing in the record to indicate that Coastal suffered an actual pecuniary loss in a subsequent sale of the oil.

In any event, the proper damages recoverable for negligent misrepresentation under section 552 are "the difference between the value of what [one] has received in the transaction and its purchase price...." *Restatement (Second) of Torts* § 552B(1)(a) (1977). *See also In re Letterman Bros. Energy Securities Litigation,* 799 F.2d 967, 974 (5th Cir.1986). The purchase price of $145.25 per metric ton is undisputed. However, Coastal presented no evidence of the oil cargo's value upon discharge. Without this crucial evidence, Coastal's claim of damages falls short of adequately establishing, the pecuniary loss necessary to prove its prima facie case.

### IV

In conclusion, we hold that Saybolt did not communicate false information upon

**14.** Q You talked about compatibility of the cargoes. The products that were put aboard the HALKI, would you consider those to be compatible products?

A Yes, I would consider them to be compatible.
Record, Vol. VI at 76.

**434**

which Coastal relied in its purchase of the No. 6 oil. Coastal has failed to establish the elements of a prima facie case of negligent misrepresentation under section 552 of the *Restatement (Second) of Torts,* and accordingly, the district court is

REVERSED.