**FIRST NATIONAL BANK, HENRI-
ETTA, Plaintiff-Appellee,**

v.

**SMALL BUSINESS ADMINISTRATION,
Defendant-Appellant.**

No. 27873.

United States Court of Appeals,
Fifth Circuit.

July 17, 1970.

William D. Ruckelshaus, Asst. Atty.
Gen., Eldon B. Mahon, U. S. Atty., Dal-
las, Tex., Stephen R. Felson, Civil Div.,
Appellate Section, Robert V. Zener,

Dept. of Justice, Washington, D. C., for defendant-appellant.

Frank Gibson, Lee Humphrey, Humphrey, Gibson & Darden, Wichita Falls, Tex., for plaintiff-appellee.

Before THORNBERRY, DYER and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The Small Business Administration (SBA) appeals from a jury verdict enforcing a loan guaranty agreement in favor of the First National Bank of Henrietta, Texas (Bank). Because we decide that the Bank had a duty to the SBA, under the relationship that existed between these parties, to exercise due care in confirming the accuracy of the financial information which the borrower furnished, and that the proof raised a jury question of whether the SBA relied on the Bank's actions, we find that the trial court erred in refusing to submit to the jury the SBA's requested special issue on the theory that the Bank was guilty of negligent misrepresentations. We therefore reverse.

THE FACTS [1]

■ In January 1965, Gerald Pittman, the borrower, initially approached the SBA concerning the availability of a small business loan. The SBA instructed him to seek the loan from his local bank, which in turn could apply for a guaranty of its loan. Pittman's application for a 40,000 dollar loan from the Bank was accepted by the Bank acting through its president, Sam Rogers, subject to the approval of an SBA guaranty. Pittman returned three documents required by the Simplified Bank Loan Participation Plan to the SBA: Pittman's loan application, the Bank's request for an SBA guaranty signed by President Rogers and Pittman's balance sheet dated December 31, 1964. Subsequently on SBA demand Pittman submitted directly to that agency a more current financial statement dated February 28, 1965.

Although the financial reports submitted showed Pittman to be stable and fairly prosperous, Robert Hedrick, the SBA loan specialist, was not convinced of the soundness of the loan. An independently ordered Dun & Bradstreet report showed that several tax and judgment liens were outstanding against Pittman. These so-called "red lights" alerted Hedrick to the possibility that this was a dangerous loan and prompted him to make a field visit to Pittman's offices. On this visit Pittman satisfied Hedrick that the judgment and tax liens had been canceled. Although the visit was not intended to be an investigation and Hedrick did not examine or audit the books, he found that the general ledger had not been posted for two months—and another "red light" started flashing.

Hedrick's general skepticism of the loan remained unabated. He was especially disturbed because, overall, the financial statements gave him the impression that Pittman, who had only been in business a short time, was doing too well. Instead of seeking further information from Pittman, Hedrick decided to go directly to President Rogers. Hedrick reviewed the whole Pittman file with Rogers, including the financial reports. Rogers told Hedrick that everything was in order and further assured him that a long course of dealings with Pittman and knowledge of his financial condition convinced Rogers of Pittman's ability to repay the loan.

Because of Rogers' assurances and recommendations, Hedrick recommended approval of the guaranty. The SBA Area Supervisor, the only other official whose approval was necessary, agreed, but noted on the application: "Banker Rogers is known and I have confidence

---

1. In determining whether the evidence justified the submission of the requested issue our review considers that evidence, where it was controverted, in the light most favorable to appellant, just as we would if the matter presented for review were a directed verdict on the entire case. *See* Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969).

in him—without strong Bank recommendation, this would be impossible—weak, with it—loan approved."

The SBA authorized disbursement of 9,900 dollars of the loan proceeds for reduction of Pittman's indebtedness to the Bank, 10,000 dollars for working capital and 20,000 dollars for the purchase of machinery and equipment. The actual disbursement by the Bank, however, released only 8,300 dollars for working capital and returned 11,600 dollars to the Bank for application against previously outstanding loans. The 20,000. dollar equipment purchase authorization technically was used to buy equipment. But it was later revealed that the machinery was purchased from Texoma Construction Company, an insolvent company controlled by Pittman which was already indebted both to Pittman and the Bank. As a result of these disbursements which superficially approximated the SBA's requirements, another 8,800 dollars was returned to the Bank on a previously uncollectable account.

About a month after he received the loan proceeds, Pittman failed completely. A subsequent SBA investigation revealed that the figures on the financial statement were false. The February balance sheet on which the loan was based (the one which Hedrick had personally reviewed with Rogers) showed assets of 87,000 dollars and liabilities of 35,000 dollars, while actual assets and liabilities were both approximately 73,-000 dollars. The represented net worth was almost 52,000 dollars, while actual net worth was only 41 dollars. There was information in the Bank's possession at all times which was directly contradictory to the information in the financial reports.

Upon Pittman's default the bank repossessed and sold certain of the equipment which had been pledged as collateral and requested indemnification of the remainder of the loss pursuant to the seventy-five percent guaranty agreement. When the SBA denied liability, the Bank initiated this suit. The SBA's defenses were: (1) the guaranty agree-

ment was voided because of the negligent advice of the Bank that Pittman was solvent and a good credit risk, (2) the distribution of the loan proceeds was not made in substantial accordance with the contract, and (3) the Bank had made misrepresentations on its application for the loan guaranty. The trial judge refused to submit requested special interrogatories on the first two theories but did submit to the jury six special issues which raised the questions of whether there were misrepresentations on the application form, whether they were material, whether they were intended to deceive, and whether they were relied upon by the SBA. The jury answered only the first issue by finding that the form contained no misrepresentations and judgment was entered for the Bank. An SBA motion for a new trial was overruled and this appeal ensued.

## LACK OF EVIDENCE TO SUPPORT THE JURY FINDING

The very first special issue, on which all the rest were hinged, asked:

Do you find from a preponderance of the evidence that the First National Bank of Henrietta in its request of the Small Business Administration for a loan guaranty to guarantee a loan to Jerry Pittman, contractor, made false representations concerning the financial condition of Jerry Pittman?

The jury answered: "No."

Since all other issues were contingent to an affirmative response to the first, the jury answered no other issue. Their single answer is clearly unsupported by the record. The Bank did not dispute that in the loan guaranty agreement it represented the amount of Pittman's loans outstanding to the Bank as 24,900 dollars when in fact it was 29,000 dollars. This court's initial reaction was that this circumstance required reversal but on examination of the entire record, no such simple disposition is possible.

The SBA made no motion that this issue be directed nor did it move for judgment notwithstanding the verdict, rather

it sought to correct the "error" by a motion for new trial, a tactic which permits the narrowest sort of review here. For example, in an almost parallel situation, this court held that a trial court's new trial ruling "is subject to an extremely limited review for abuse of discretion." Southern Farm Bureau Cas. Ins. Co.v. Palmer, 263 F.2d 206 (5th Cir. 1959). *See also* Powell v. Lititz Mut. Ins. Co., 419 F.2d 62 (5th Cir. 1970).

■ Since there was absolutely no evidence in the record upon which the jury could base its "no" answer to this special interrogatory, the proper course for the SBA to have followed was to request a direction on the issue and if that were denied, to move for judgment notwithstanding the verdict. For some undiscernible reason it chose not to follow this procedurally correct and logical course but instead *it requested* that the issue be submitted to the jury. Whether this was a deliberate tactic which had behind it an imagined strategic purpose of leading the jury the first step down the path of the defendant's case by starting off asking them to find what all should see was an undisputed proposition, or whether it was due to simple inadvertence, is immaterial. The SBA cannot now complain of an error in the trial that it directly provoked and induced. R. P. Farnsworth & Co. v. Tri-State Const. Co., 271 F.2d 728 (5th Cir.), cert. den. 362 U.S. 941, 80 S.Ct. 807, 4 L.Ed.2d 770 (1960); American Cyanamid Co. v. Sparto, 267 F.2d 425 (5th Cir. 1959); Stokes v. Continental Assur. Co., 242 F.2d 893 (5th Cir.), cert. den. 355 U.S. 890, 78 S.Ct. 263, 2 L.Ed.2d 189 (1957); United States v. Wurtsbaugh, 140 F.2d 534 (5th Cir. 1944). Any other ruling would permit a party to deliberately manufacture errors on which to get a reversal, should the jury find against him. This being so we must proceed to the remaining points.

## NEGLIGENT ADVICE BY THE BANK—DUTY AND RELIANCE?

This brings us to a consideration of SBA's assignment of district court error in refusing to submit special issues to the jury covering the Bank's alleged negligence in misrepresenting the accuracy of the financial information furnished SBA concerning its borrower, Pittman. At the outset we are met with the Bank's contention that conceding, *arguendo*, there was error, it was not properly preserved for review. The Bank asserts that the SBA did not make a proper objection after the trial court's failure to submit the requested issues and that this omission violates the mandate of Rule 49(a), Fed.R.Civ.P., which provides, inter alia: "If [in submitting special issues to a jury] the court omits *any issue of fact raised by the pleadings or by the evidence*, each party waives his right to a trial by jury of the issue so omitted unless *before the jury retires* he demands its submission to the jury." (emphasis added)

■ The Bank contends that after the court instructed the jury and presented six special issues for their answer, the jury was thereupon directed to retire to the jury room and then the objections to the charge were taken. The SBA does not deny that this was the order of events but responds that they merely followed a procedure adopted by the trial court which they were advised was the regular practice in this court. The Bank correctly argues that such a local practice would be in violation of the rule. Court procedure may be regulated by local rule when not provided for in the federal rules and then only "in [a] manner not inconsistent with these rules." Fed.R.Civ.P. 83. The jury is entitled to the court's complete charge before it begins any part of its fact deliberations and determinations. However, the record before this court on this point does not disclose with sufficient clarity what actually happened to allow us to find either that the district court compelled the parties before it to follow an impermissible local practice or that the actions taken by the SBA amounted to a waiver of its previous demand in the written pretrial order and in a later charge conference,

that the issues be submitted.[2] This is especially true where, as here, the party now complaining was present and participated fully in the procedure without the slightest whisper of a suggestion or objection.[3]

The Bank amplifies its contention of waiver of these issue submissions by arguing that when the court allowed the parties to express any objections they might have to the court's charge, the SBA did not make any assertion that was sufficiently specific to save it from the waiver stricture of Rule 49(a). We do not agree. The SBA had, at the pre-trial level, requested in writing that these issues be submitted to the jury and had again renewed this request at the pre-charge conference between the court and counsel. When the court invited objections the demands were repeated by reference to the prior specific written issues twice submitted. The court was adequately apprised of the issues that the SBA contended should be submitted for jury decision. We see a difference in language and purpose between the waiver provisions of Rule 49(a) and the parallel bar of review provided under Rule 51 covering objections to jury instructions, which reads:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" (emphasis added)

Instructions are required to be considered by a jury as a unit. Frequently what is included in one respect will completely eliminate or greatly modify the need for or desirability of other previously requested instructions. This interplay was evidently a strong consideration in the inclusion of the emphasized language in Rule 51 which finds no counterpart in Rule 49(a). Since we are adjured by Rule 1 to give a construction to Rule 49(a) which will secure the just, speedy and inexpensive determination of every action, we refuse to hold it necessary for a party to recite at length every requested special issue he has previously submitted to the court to avoid a waiver of his right to assert that its refusal was error. This is not to say that a clear demand bringing the omitted issues still desired to the attention of the court is unnecessary. If the court should modify a requested issue or give parts of several issues so that a general reference to the prior submission would not be a clear demand, as was the situation before the court in Delancey v. Motichek Towing Service, Inc., 427 F.2d 897 (5th Cir. 1970), a different case would be presented even under Rule 49(a). No such confusion can be said to be present in the objection by SBA in the case sub judice. Waiver cannot be imputed on this record. We therefore proceed to a consideration of the merits of whether the negligence issues demanded should have been submitted.

There was sufficient evidence in the record to raise a jury question of whether Rogers used due care in determining the accuracy of the financial statements and recommending the soundness of the loan. For example, the financial statement represented that Pittman's total loan indebtedness was 24,500 dollars while in fact he owed the Bank alone 29,000 dollars. Moreover, Rogers had recently witnessed the negotiation and

---

2. *See* Ala. Great So. R. R. v. Johnson, 140 F.2d 968, 973 (5th Cir. 1944), in which the court in a Rule 51 case found that even though the record showed that the jury had retired before objections were permitted "the charge shall not be · regarded as final and * * * the jury shall not be considered as having retired to consider their verdict until all exceptions to it have been made and passed on. * * *"

3. The record here merely discloses that the reporter noted in a parenthetical narrative comment that the jury was permitted to retire; however, it was not shown whether deliberation was allowed to begin before the objections were taken and any new demands for issues were made.

signing of a note whereby Pittman borrowed an additional 15,000 dollars from a private individual. Rogers knew of yet another loan for 15,000 dollars payable to another bank. Thus, Rogers knew of loan indebtednesses of 59,000 dollars yet recommended another loan on the basis of a financial report revealing only a 24,500 dollar total loan indebtedness. He also was possessed of bank records showing that in the seven months preceding the disbursement of loan funds the Bank had returned because of insufficient funds 373 checks written by Pittman on his account in a total amount of 60,000 dollars.

The Bank argues that although the financial reports were attached to the Bank's application for loan guaranty and according to its terms was made a part thereof, Rogers never looked at them and so could not have noted any errors. There was evidence in the record to the contrary on which the jury could reach a different result—Hedrick's testimony that he questioned Rogers about the financial statements, which the jury could have believed and we must credit here. A jury would also be entitled to find that Rogers was negligent in recommending a loan as being sound without consulting records within his control, which would have disclosed his recommendation was completely unwarranted. In fact, Rogers admitted at the trial that his actions on behalf of the Bank were "a little bit on the stupid side."

■ However, every abstract instance of lack of due care does not result in liability. To be actionable it must concur with a duty owed to one who is injured by such lack, and even with these truisms conceded, the question remains whether the SBA can avoid liability under a loan guaranty agreement made in reliance on negligently formulated and supplied misrepresentations and advice by the Bank-applicant.[4]

■ Although the contract was executed in Texas and the alleged negligence occurred there, we have concluded that federal common law controls the rights of the parties. See C. Wright, Law of Federal Courts § 60 (2d ed. 1970). By this we do not mean to imply that a different result might be reached under the law of Texas, for the parties have given us no indication that the state would apply a different standard from the one we adopt. In a contract suit where the United States is a party, as a general rule the contract principles of federal law govern. See, e. g. United States v. Standard Rice Co., 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104 (1944). Likewise, the tort questions in this case are appropriately answered by federal law. See United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L. Ed. 2067 (1947). The reason behind the rule, uniformity of decision, is plainly applicable to the instant case. The policy manifested in the Small Business Act is national in scope. Small Business Act, 15 U.S.C.A. § 631 et seq. (1963). The SBA operates identical programs in every state. When faced with an analo-

4. On its face, the guaranty agreement might have an answer. It required that "Prior to the first disbursement to Borrower on account of the Loan, Bank shall receive: * * * Satisfactory evidence that since the date of Borrower's last financial statement submitted in connection with the Loan, there has been no adverse change in Borrower's financial condition, organization, operations, business prospects, fixed or other properties, personnel or any condition of Borrower which is sufficiently serious in the opinion of Bank to warrant withholding disbursement on account of the Loan and which has not been prudently remedied." There can be little doubt that the Bank did not comply with this provision. Such compliance would possibly have revealed Pittman's serious financial difficulties. The SBA argues to us that this breach of the contract provides a defense to the Bank's suit on the contract. Because that theory of the case was not presented to the court below and presents a new and different defense, it will not be considered on this appeal. See Liberty Mutual Ins. Co. v. Davis, 412 F.2d 475 (5th Cir. 1969).

gous situation the Supreme Court stated:

> "The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain." Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943).

█ Under most circumstances a loan guaranty agreement may be voided for misrepresentation by the one receiving the guaranty only where the misrepresentation amounts to fraud and the guarantor has participated in or had knowledge of the debtor's fraud or where he has actually committed the fraud. *See, e. g.*, Rabon v. Putnam, 164 F.2d 80 (10th Cir. 1947); Standard Sur. & Cas. Co. v. Olson, 150 F.2d 385 (8th Cir. 1945); United States v. Basil's Family Supermarket, Inc., 259 F. Supp. 139 (S.D.N.Y.1966) The SBA in this case did not present a case of actual fraud by the Bank. Without getting into the semantic quagmire of whether the Bank was guilty of constructive fraud, we hold that the situation in the instant case is sufficiently distinguishable from the ordinary guaranty agreement so that a negligent misrepresentation of material facts by the Bank here would constitute a complete defense to SBA liability on the guaranty.

In the usual guaranty arrangement the creditor is not a party to the contract and thus has no duty to the guarantor other than that of abstaining from fraudulent conduct. *See, e. g.*, United States v. Basil's Family Supermarket, Inc., *supra* at 139. In the instant case, however, the Bank applied to the SBA for the guaranty. The Bank paid the consideration and the Bank was to be benefited directly.

█ Under these circumstances, where the Bank knew that the SBA was relying on its professional judgment in a business relationship, the Bank has a duty to use due care in providing information and advice to the SBA. *See* Lesser v. Wm. Holliday Cord Assoc., Inc., 349 F.2d 490 (8th Cir. 1965); Hedley Byrne & Co., Ltd. v. Heller Partners, Ltd. [1964] A.C. 465. The proposed draft of the Restatements (Second) of Torts, § 552, correctly states the rule of law applicable to misstatements of facts such as were here involved:

(1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of another in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered

(a) by the person or one of the persons for whose benefit and guidance he intends to supply the information, or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction which he intends the information to influence, or knows that recipient so intends, or in a substantially similar transaction.

█ In the instant case, the nature of the relationship was business. In that context, the Restatement realistically recognizes that businessmen who justifiably rely on the advice and expertise of other businessmen, holding themselves out in the community as possessing unique skills, are entitled to expect that one possessing skill will exercise it with due care in the course of his business relationships.

Rogers held himself out in the community as a banker. Thus, in his business relationships he was required to exercise the skill and competence that the ordinary banker in his locale under the same or similar circumstances would exercise. *See* Prosser, Torts, § 32 (3d ed. 1964).

Moreover, the overall position of the Bank in this transaction strengthened its duty to use reasonable care. If the guaranty was good, the maximum direct risk to the Bank on the 40,000 dollar loan was only the one-fourth unguaranteed portion, 10,000 dollars. Disbursement of the loan resulted in 11,600 dollars being returned to the Bank to pay off part of Pittman's pre-loan indebtedness. Unknown to the SBA, however, an additional 8,800 dollars was immediately returned to the Bank through Pittman's equipment purchase from the Bank's insolvent debtor. Thus, under the economic realities of the disbursement the Bank received in cash over 20,000 dollars on loans which appear to to have been otherwise uncollectable. Where the Bank possessed an undisclosed financial interest which was dependent on the execution of the guaranty agreement, its duty to use due care in furnishing answers to requests for information and advice to the SBA is intensified. Even if we assume that the Bank did not have an affirmative duty to disclose this information,[5] it was obliged to use reasonable care to determine the accuracy of the information and advice it actually provided.

Equally as critical as the Bank's duty to use due care is the multifaceted fact question of the guarantor's reliance—whether the SBA relied on the Bank's advice and information, whether that reliance was justified, and whether the Bank knew of the SBA's reliance.

The SBA's reliance is indicated in the record. SBA memoranda made at the time of the loan approval reveal that the determinative event in the approval of the guaranty was the solid recommendation given by Rogers. The SBA offered proof that it relied on the Bank because of its officer's business judgment and proximity to local affairs. Rogers was simply in a better position to judge the soundness of the loan than federal officials from outside the community.[6] The jury could also have found that the SBA was justified in considering Rogers' experience of former dealings with the borrower and the quite obvious fact that the Bank had control of records that would prove or disprove the validity of the financial statements and the soundness of the loan.

The Bank argues that the SBA was not justified in relying on it since they were co-actors, each working together to determine the validity of the loan, ergo any negligence on the part of the Bank must also be negligence on the part of the SBA. That is simply not this case. The Bank made an independent application for a loan guaranty to the SBA and, under the state of the facts we must accept, provided false information on which it was approved. The Bank, not the SBA, had a former course of dealing with Pittman. The Bank represented that the application was in order and the loan was sound. The misrepresentations which induced the approval of the application were based on information within the possession of the Bank. Even if the parties were to be labeled co-actors, as to other parts of this trans-

---

5. See "Unauthorized Disbursement of the Loan", *infra.*

6. This type of local reliance is built into the system of the Act. Federal policy favors cooperation between the SBA and local lending institutions. The Simplified Bank Loan Participation Plan contemplates reliance on local personnel who know best the circumstances within their own communities. *See* In re Fried Furniture Corp., 293 F.Supp. 92 (E.D.N.Y. 1968), aff'd on opinion below, 407 F.2d 360 (2d Cir. 1969). This rational preference for the involvement of local people provides, at least in part, justification as a matter of law for the SBA's reliance.

action this negligence of the Bank in its own affairs should not be attributable to the SBA.

Finally, there is abundant evidence in the record from which a jury could have reasonably concluded that Rogers knew that the SBA was relying on his judgment. He admittedly signed a form which represented that the loan was sound. Common sense would tell him that that recommendation would be acted on. Moreover, if the SBA's version of the evidence is fully adopted, Rogers appears to be pushing the loan and implicitly asking the SBA to rely on him. Furthermore, there was evidence to show that SBA officials had visited the Bank on numerous occasions to explain directly the procedures of the SBA loan programs, among which was its reliance on local people.

We conclude therefore that the Bank owed a duty to the SBA to use reasonable care in providing answers to direct questions calling for information and advice. If a jury determines that the Bank breached this duty and that the breach resulted in the formation of the guaranty agreement, then the SBA has stated a complete defense to liability under the guaranty agreement. *See* Rocky Mountain Tool & Machine Co., Inc. v. Tecon Corp., 371 F.2d 589 (10th Cir. 1967). Thus the court erred in refusing to submit this requested instruction.

## UNAUTHORIZED DISBURSEMENT OF THE LOAN

The SBA requested that the jury be presented a special issue on the theory that the Bank's failure to disburse the proceeds of the loan in accordance with the guaranty agreement released the SBA from liability.

The guaranty agreement provided: *"Termination of Agreement.* SBA shall be released from any obligation hereunder, or any obligation to purchase the Note, unless Bank has substantially complied with all of the provisions of this Agreement, or upon the happening of any one or more of the following events:

"(a) Failure of Bank to close and disburse the Loan *substantially* in accord with the terms and requirements of the Authorization; * * *" (emphasis added)

The instructions on the printed disbursement schedule form furnished by the SBA emphasized that the amounts set out in the prior authorization are regarded as the *"approximate"* amounts to be released. If the Bank's sub silentio interest in the Texoma equipment purchase was not involved, we would have no problem in affirming the court's refusal to put this issue to the jury for resolution. The actual disbursements as shown were "substantially" and "approximately" the same as those authorized. Moreover, these actual disbursements were reported to SBA on its own form and accepted without a quibble.

Since this case must go back for another trial on the misrepresentation issue and we have expressly declined to go so far as to place our reversal on a finding of a fiduciary undertaking by the Bank, the effect of the charge that they were in a self-dealing position in the Texoma purchase is greatly minimized. We therefore abstain from any ruling on the court's refusal to submit this issue. At the same time we deem it appropriate to here comment that if the issue had been properly developed and a self-dealing interest by one in the Bank's position had been proved to exist, then the disbursement schedule as it really should have been drawn would have shown Bank payments of over 20,000 dollars as opposed to an authorized loan repayment to it of only 9,900 dollars and clearly would have constituted a substantial and guaranty-voiding variance.

Reversed and remanded.