**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**TEXARKANA TRAWLERS, a Partnership, et al., Defendants-Appellees.**

**No. 87–2508.**

United States Court of Appeals,
Fifth Circuit.

June 6, 1988.

---

Susan M. Sleater, Civil Div., Leonard Schaitman, U.S. Dept. of Justice, Mee Lon Lam, Trial Atty., Civ. Div., Torts Branch, Washington, D.C., for plaintiff-appellant.

A. Paul Miller, Hubbard, Patton, Peek, Haltom & Roberts, James N. Haltom, Texarkana, Tex., for all defendants-appellees except Blackmon.

Before GARZA, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The United States, through the National Marine Fisheries Service (the "Service") of the Department of Commerce, sued Texarkana Trawlers ("Trawlers") for breach of contract, seeking to recover money the Service lost when Trawlers defaulted on certain fishing boat loans. Under some of the subject contracts, Trawlers agreed to reimburse the Service for any default on loans which the Service had guaranteed and paid off. Under the remaining contracts, the Service had lent money directly to Trawlers' predecessor.

Trawlers defended by alleging that it had been wrongfully induced[1] to accept the

---

1. This defense is usually known as "fraudulent inducement" or as "fraud in the inducement."

refinancing contracts upon which the government sues. Trawlers, based upon its affirmative defense of wrongful inducement, sought rescission of the refinancing deal, forgiveness for the refinanced debt it had incurred, and damages equal to the value of boats Trawlers says it lost because of the government's misrepresentations. The district court, after a bench trial, awarded Trawlers all the relief it sought. 661 F.Supp. 25. The government, citing its interpretations of the Federal Tort Claims Act ("FTCA") and federal common law of contracts, appealed. We now reverse.

## I.

The government, through the Service, operates several direct loan and loan guaranty programs under Title XI of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1271–79c, and section 4 of the Fish & Wildlife Act of 1956, 16 U.S.C. § 742c. These loan programs exist, in part, to promote the American fishing industry. Trawlers, a member of that industry, assumed over $1,350,000 in pre-existing loans under these programs when Trawlers bought seven shrimping trawlers in June 1982.[2]

The terms of the loans assumed by Trawlers, which included loans the government had made and others it had guaranteed, were complex. Each of Trawlers' boats was individually mortgaged, and each loan which Trawlers assumed was individually secured by one of Trawlers' boats. Each of the guaranteed loans was particularly intricate, since each of Trawlers' partners and the government had guaranteed each of these loans. The maze of terms these guaranteed loans created is central to Trawlers' defense. Consequently, we now describe the government loan guaranty program in more detail.

The Service administers the program under Title XI of the Merchant Marine Act. When the Service guarantees a loan under Title XI, it requires the debtor to guarantee that same loan to the Service. The Service also investigates the financial condition of the fishing concern receiving the loan, and refuses to guarantee loans if the debtor is financially unable to pay off the loan. Through these arrangements, the Service can protect its position, since it can attempt to recover from the debtor any amounts which it is called upon to pay the bank pursuant to the government guaranty. Consequently, Title XI creates a "triangular" system of contractual relationships: The debtor exchanges its guaranty for the government's guaranty to the bank, and the bank exchanges its money for the debtor's promissory note, a security interest in the debtor's vessels, and the government's guaranty.

With their finances thus arranged, Trawlers set their boats to the business of fishing. Trawlers, however, did not itself operate the boats, but leased them to others to operate. Trawlers eventually leased six[3] of its vessels to Henry Singleton, a shrimp fisherman who operated a fishing fleet of twenty to twenty-five shrimpers, including the Trawlers' ships. Singleton owned some of these craft himself and leased others.

Unfortunately, Singleton was not a successful fisherman. His fleet first ran into economic difficulty in American waters. Trying to change his luck, he moved the fleet, without notifying Trawlers,[4] to Brazil. Fishing Brazilian waters did not prove economically feasible either, and most of the owners of the Singleton vessels—including Trawlers—defaulted on their loans

---

However, these terms are imprecise, because the defendant does not have to prove that the plaintiff intended to mislead the defendant to establish "fraud in the inducement." Consequently, we accept Trawlers' invitation to refer to this defense as "wrongful inducement."

**2.** Of the loans Trawlers assumed, over $1,000,-000 was in commercial loans the government

guaranteed, and over $350,000 was in loans the government provided directly.

**3.** The seventh boat was lost when the Colombian government confiscated it.

**4.** The parties dispute whether Singleton asked the federal government for permission to move the fleet to Brazil. For the purposes of this appeal, however, this point is irrelevant.

in 1983. Default, however, did not destroy Singleton's operations.

Sometime in 1983, Singleton began negotiating a refinancing package with the Service's agent, Thomas Allen.[5] Allen and Singleton ultimately agreed to seek refinancing for the Title XI loans from a single lending institution for at least seventeen of the fleet's ships, including all of Trawlers' vessels. The more shrimpers Singleton and Allen could "package" together, the lower the risk a single lending institution would assume for refinancing the craft. The lower the risk assumed, Allen and Singleton reasoned, the lower the interest rate they could secure to refinance the fleet.

To refinance that many ships, however, Allen needed to secure the assent of all the owners. Since six of the seventeen vessels which Allen and Singleton wanted to refinance belonged to Trawlers, Allen contacted Trawlers' managing partner, Edward Page Oliver. Oliver, it turned out, was not inclined to refinance Trawlers' boats. Singleton had not informed Oliver or any other Trawlers partners that Singleton had sailed to Brazil. Oliver apparently thought that fishing in South American waters was risky,[6] and he did not trust Singleton to protect Trawlers' vessels from that additional risk. For such protection, Oliver preferred to recall the ships to the United States, resell them,[7] and pay off Trawlers' debt. Oliver claims that he opposed refinancing plans until after his conversations with Allen in March 1984.

Oliver was impressed with what Allen had to say, and Allen succeeded in convincing Oliver that a refinancing package deal was the best chance Trawlers had of rebounding from default. Allen told Oliver that he could work out a "package deal" with a single bank and that the interest rates on the loans would be lower than Trawlers could otherwise obtain. Allen also told Oliver that the deal for all the owners would be under the same terms and conditions.

Oliver interpreted Allen's statements to mean that all the terms and conditions of the *security* agreements would be the same. But Allen apparently meant only that all of the terms and conditions (such as the interest rates, amounts of payments, and frequency of payments) of the *loan* agreements would be the same.[8] Oliver, believing that all the boats were secured on identical terms and conditions, agreed to refinancing. On April 17, 1984, all of the owners convened in Houston and closed the deal.

The refinancing arrangement, however, did not secure all loans equally. Each of the loans was secured by a boat, by a government guaranty, and by a guaranty from the owner of the boat secured.[9] Owner and fisherman Singleton, however, also guaranteed all the loans, *except Trawlers' loans*, secured by boats he did not own.[10]

---

5. At the time of trial, Allen was the chief of the Financial Services Branch for the Southeast Region of the Service, one of five regions into which the Service is divided nationally. Allen was in constant contact with both Singleton and Trawlers throughout the entire relevant period.

6. *See supra* n. 3.

7. The district court found that each of Trawlers' six boats was worth $200,000 at the time Trawlers refinanced the ships.

8. Our decision in this case does *not* turn on what meaning Allen in fact intended to convey when he said that the "package deal" would put the owners "all under the same terms and conditions." Intent is not an element of Trawlers' defense of fraud in the inducement of the refinancing contracts. *See* Restatement (Second) of Contracts §§ 162, 164. *See generally id.*

§§ 159 et seq. We suggest this interpretation of the March 1984 Oliver/Allen conversations *only* to emphasize that parties to complex financial deals can easily misunderstand each other. Additionally, we note that the district court ignored the question of intent and made only the conclusory "finding" that Allen's statement "was a misrepresentation of a material fact and a fraudulent misrepresentation." 661 F.Supp. at 27.

9. The government's guaranties ran to the bank that loaned the refinancing money. The owners' guaranties, however, ran to the government to protect the latter in the event it had to pay off some loans.

10. Apparently, several of the other owners were financially unstable, and the government refused to guarantee their loans unless Singleton guaranteed those loans as well.

Consequently, Singleton could protect himself from foreclosure only if those vessels could be resold. Singleton therefore had a powerful economic incentive to prefer to preserve *non-Trawlers* boats if he ever had to decide which part of the fleet to save.

Subsequent events served only to worsen Trawlers' position. In July 1984, Singleton stopped lease payments to Trawlers, and Trawlers stopped paying on its loans. In August 1984, Oliver first discovered that the other ships in the fleet were better secured than Trawlers' boats. Eventually, Singleton folded his fishing operations, and all the craft, except Trawlers', returned to the United States. The bank defaulted Trawlers on its loans and enforced the government's guaranties. The government in turn foreclosed its security agreements with Trawlers. Trawlers, which could not rely upon the equity in its shrimpers to satisfy the government's demands,[11] refused to honor its guaranties to the government.

The government sued Trawlers for breach of Trawlers' guaranty contracts and for defaulting on the loans the Service had made directly to Trawlers.[12] Trawlers alleged, as an affirmative defense, that it should not have to reimburse the government because the government had wrongfully induced Trawlers to enter into the refinancing contracts. The district court ruled for Trawlers,[13] and the government appeals.

## II.

The government urges us to consid-

---

**11.** The district court found that "[Trawlers] suffered injury as a result of [its] reliance on the [Service's] misrepresentations in that [Trawlers'] vessels were subjected to substantial risks that would not have existed had the refinancing arrangement been as represented.... The risks imposed upon [Trawlers] as a result of the [Service's] fraudulent misrepresentations resulted in the complete loss of [Trawlers'] vessels." 661 F.Supp at 27. To understand why Trawlers could have returned its six vessels to the United States in April 1984 but no longer can, we must turn to the record. It suggests that the Brazilian company whose docks Singleton used for his fleet, Ipecea, acquired a lien sometime after April 1984 against Trawlers' boats. Ipecea seized control of the boats and has allowed them to deteriorate rapidly until the vessels are no longer seaworthy. Ipecea apparently refuses to release the boats or do anything to refurbish them until someone pays Ipecea the debt owed it. Moreover, unseaworthy boats are also uninsurable, and the boats apparently are no longer capable of returning to the United States without major repairs.

**12.** As of October 1986, Trawlers owed the government $1,750,120.23 for the guaranteed loans the government paid off and $407,879.79 for the loans the Service made directly to Trawlers. Although its math seems slightly inaccurate, the government is currently seeking $2,158,000.00 from Trawlers.

**13.** The district court's conclusions of law are short, and we therefore reproduce them here in substantial part:

The statements by the duly authorized agents of the [Service] to the effect that all participants in the refinancing agreement devised and designed by the National Marine Fisheries Service would be treated equally and under the same terms and conditions was a misrepresentation, that was material and/or fraudulent, that induced [Trawlers] into making the Notes, Mortgages, Agreements and Personal Guaranties that made up the refinancing agreement. [Trawlers'] reliance on such misrepresentations was justified. The actions by the [Service] constituted fraud in the inducement and resulted in damages to [Trawlers]. The Notes, Mortgages, Agreements and Personal Guaranties, therefore, may not be enforced by the [Service] against [Trawlers]. Restatement (Second) Contracts, §§ 159 through 173, Introductory Note; 17 Am.Jur.2d "Contracts" § 151; *Homelite v. Trywilk Realty Co.*, 272 F.2d 688 (4th Cir.1959); *Fredonia Broadcasting Corporation, Inc. v. RCA Corporation*, 569 F.2d 251, (5th Cir.), *cert. den.*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed. 2d 167 (1978); *Stone v. Lawyers Title Insurance Corporation*, 554 S.W.2d 183 (Tex. 1977))....

The Personal Guaranties signed by the [Trawlers' partners] are not enforceable by the [Service] because the [Service] was a participant in the fraud that led to the execution of the Personal Guaranties. *Standard Surety & Casualty Co. v. Olson*, 150 F.2d 385 (8th Cir.1945); *United States v. Basil's Family Supermarket, Inc.*, 259 F.Supp. 139 (S.D.N.Y.1966); *First Nat. Bank, Henrietta v. Small Business Admin.*, 429 F.2d 280 (5th Cir.1970).

661 F.Supp. at 28. The district court voided the refinancing agreement, allowed Trawlers to keep the money it had gained under that agreement, and awarded Trawlers $1,200,000 as a set-off to Trawlers' remaining debt to the Service. (The $1,200,000 set-off represents money Trawlers would have raised from the sale of its six vessels in April 1984. *See supra* n. 7.)

er several issues raised under the FTCA [14] and the federal common law of contracts.[15] Having carefully considered the government's arguments and Trawlers' responses, we have concluded that this case turns on two of those issues: First, did Trawlers have the legal right to rely upon Allen's characterizations of the "package deal," or did Trawlers instead have a duty to investigate further the terms of the security agreements? [16] Second, can rescission return the parties to the *status quo ante* after the United States has performed fully its guaranties and paid off Trawlers' loans? A negative answer to either question requires reversal of the judgment below.[17]

On the first issue, the district court accepted Trawlers' argument that it relied

justifiably upon Allen's statements, but the court apparently did not consider the level of ambiguity inherent in the Allen/Oliver phone calls.[18] In light of that ambiguity, a reasonable person could easily doubt Trawlers' characterization of the phone calls, in which the terms used were simply too broad and imprecise to serve as anything more than an invitation to deal with the government. We question whether, when the most precise term used ("package deal") in initial negotiations is inherently ambiguous, either party can rely justifiably solely upon what the other party has said, without a duty of further inquiry.[19] *See Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 826 F.2d 424 (5th Cir.1987) (defendant not liable for fraudulently misrepresenting

---

**14.** The government asserts that the FTCA (28 U.S.C. §§ 1346(b), 2671) bars *affirmative defenses* against the United States based upon fraud as well as *claims* against the United States based upon fraud. Although the plain language of the Act covers only claims, we do not reach this issue today.

**15.** Both parties agree that federal law governs the refinancing contracts at issue. We merely reiterate what we said in *United States v. Little Joe Trawlers*, 776 F.2d 1249, 1251 (5th Cir.1985), a case that examined the government's attempt to enforce private guaranties under one of the programs involved in this case:

We sound a warning to future litigants in contract suits where the United States is a party that federal law governs the rights and duties of the United States on commercial paper. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).... In this circuit, relying on *Clearfield Trust*, we have ruled that federal law governs a guaranty contract entered into by the United States. *First Nat. Bank, Henrietta v. Small Business Admin.*, 429 F.2d 280 (5th Cir.1970). The desire for uniformity of decisions was a factor in *Henrietta, id.* at 286, and it should be a factor in adjudicating the United States' rights in suits like this one, arising as a result of the government's role in facilitating loans under Title 11 of the Merchant Marine Act.

**16.** To establish the defense of wrongful inducement, Trawlers must prove

1. That the government's representation was false;
2. That the government's representation was material;
3. That the misrepresentation operated as an inducement to [Trawlers to enter] into the contract;

4. That [Trawlers] had the legal right to rely on its accuracy; [and]
5. That [Trawlers] did in fact rely on the representations to [its] injury.

B. McBride & T. Touhey, *Government Contracts* § 13.30.

**17.** The district court concluded that Trawlers relied justifiably upon the Service's misrepresentations, and awarded Trawlers (i) rescission of the refinancing contracts, (ii) the right to keep the money it obtained under the refinancing contracts, and (iii) $1.2 million for Trawlers' six lost vessels. *See supra* n. 13.

**18.** *See infra* n. 19.

**19.** Indeed, "package deal" is so ambiguous a term that we suspect that what Allen meant was not what Oliver thought Allen meant. Allen testified at trial that when he said the refinancing deal was a "package deal," he meant that the *loan* terms would be identical for all the boat owners. Oliver testified that he understood Allen to mean that *all* the terms, including the terms of the security agreements, would be identical.

Where the information recipient misunderstands what the information provider meant, there is no misrepresentation at all. Misunderstandings may be mistakes, but they are not misrepresentations. However, we cannot decide this case on the issue of whose meaning prevails. The district court found only that Allen's statement "was a misrepresentation of a material fact and a fraudulent misrepresentation." 661 F.Supp. at 27. This finding does not indicate whether the district court simply did not believe Allen's testimony, or erroneously included misunderstandings in its definition of misrepresentations. We are unwilling to overturn a district court's findings that may be based upon a witness's credibility.

**304**

quality of oil sold where, unlike a reasonable participant in the oil industry, plaintiff failed to recognize that defendant based its test report statements upon composite figures representing several oil quality tests). We need not decide this issue, however, since we answer the second question—regarding return to the *status quo ante*—in the negative and reverse on that sufficient ground alone.

### III.

 Trawlers' defense fails because the defense of wrongful inducement is no longer available to Trawlers to defeat or diminish the government's claim for breach of contract. A contract defendant pleading the defense of wrongful inducement is asserting that it agreed to one or more contractual provisions only because the plaintiff misled the defendant into believing untrue statements. Under familiar terms of the common law of contracts, the party who has been wrongfully induced to accept objectionable contractual terms is unable to give its informed consent to those provisions. Consequently, the defendant may avoid performing its obligations under any terms to which the plaintiff has wrongfully induced the defendant to consent. Such action on the defendant's part amounts to "termination" of the contract while it is executory. If the plaintiff has wrongfully induced the defendant to consent to the contract itself, the defendant may rescind the entire contract.

 Rescinding a contract because it was wrongfully induced, however, is not the same as suing for fraud. The *defense* of wrongful inducement is only a shield against the plaintiff's breach-of-contract claim, *not* a sword which the defendant can use to claim damages against the plaintiff. Awarding damages, especially reliance damages, converts the *defense* of wrongful inducement into a positive *claim* based upon the government's deceit. *Cf. First National Bank, Henrietta v. S.B.A.*, 429 F.2d 280, 287 (5th Cir.1970) (*quoting* Restatement (Second) of Torts § 552) (actions for misstatements in the guaranty context sound in tort). However, the FTCA bars *claims* for fraud against the federal government. *E.g., United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). Consequently, the district court improperly awarded Trawlers $1.2 million for the vessels it lost after it entered into the refinancing agreement.

 Moreover, the court improperly allowed Trawlers to retain the loan money Trawlers obtained under the refinancing contracts. Rescission, unlike termination, requires the parties to "unmake" the contract. Rescission, as the government correctly argues, attempts to restore the parties to the rescinded contract to the *status quo* that existed before the contract was formed. *See New York Mail & Newspaper Transportation Co. v. United States*, 139 Ct.Cl. 751, 154 F.Supp. 271, 276 (Reed, J., sitting by designation), *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). The parties can restore each other to the *status quo ante* only if they can restore to each other what each took under the rescinded contract. If it is impossible to insure that all property exchanged is returned, then the contract cannot be rescinded. *See Treasure Salvors v. Unidentified Wrecked & Abandoned Sailing Vessel*, 459 F.Supp. 507, 523 (S.D.Fla.1978) (applying Florida law), *aff'd sub nom. Florida v. Treasure Salvors*, 621 F.2d 1340 (5th Cir. 1980), *rev'd on other grounds*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). *See also Dahl v. United States*, 695 F.2d 1373, 1382 (Fed.Cir.1982). Even the party seeking rescission must return whatever property it has received under the rescinded contract. *Id.*; 17A C.J.S. Contracts § 439.

Obviously, it is easiest to rescind a contract that governs only the parties' rights in tangible property. If, on the other hand, one of the parties has alienated intangible things, such as services, then the benefactor cannot return the property. At best, a court can only value the intangible property rendered and order the receiving party to "return" to the rendering party the cash value of the property received. *Cf. Caribbean Insurance Services v. American Bankers Life Assurance Co.*, 754 F.2d 2

(1st Cir.1985) (under Puerto Rican law, party receiving services must pay equivalent value for the services received under a rescinded contract).

Only with great difficulty may the receiving party rescind a services contract the rendering party has fully executed. Some states, such as Louisiana, solve this problem by refusing to allow parties to rescind contracts which one side has performed fully. In *Gregson v. United Life & Accident Insurance Co.*, 629 F.2d 1075 (5th Cir.1980), for example, this court applied Louisiana law and refused to rescind an insurance broker's contract. The broker, with the company's approval, had sold life insurance to a high-risk customer for low-risk rates. After the company realized its error, it refused to pay the broker his fee. The broker sued, and the insurance company sought to rescind the brokerage contract on the ground that mutual mistake invalidated the insurance contract. We held that Louisiana law barred rescission of a contract which one side has performed fully, and that the broker had performed fully his services. We consequently denied the insurance company's defense.

Louisiana's rule appears to us to have achieved a just result in *Gregson*. Rarely can a court measure the value of intangible property by anything other than the contract to which the parties agreed. Consequently, we believe that courts should only rarely, if ever, rescind a service contract to the detriment of a party that has performed fully.

■ Nonetheless, we need not, and we do not, adopt the Louisiana rule here. The facts of this case present even stronger reasons to refuse to allow Trawlers the right to rescind these contracts. Under the refinancing contracts, the government undertook only one duty: to pay off Trawlers' refinanced loans should Trawlers default. That single duty, which the government has performed fully and in good faith without receiving anything in return, ran to the lending bank, not to Trawlers. To allow Trawlers to rescind its guaranties to the government would be to disturb the complex contractual relationships, which no single contract defines, among *three* parties (Trawlers, the Service, and the bank).

Moreover, Trawlers benefited from its contracts with the government not because of the inherent value of government guaranties, but because those guaranties bought loan proceeds which Trawlers desperately needed. If Trawlers had rescinded the contracts before the government honored its guaranties to the bank, Trawlers would have had to return its loan money to the bank. The only reason Trawlers no longer owes money to the bank is that the government has performed its contractual duties faithfully and fully. Trawlers' obligations have not changed simply because it now owes money to the government instead of to the bank.

■ Moreover, even if the government's misrepresentation were held to reduce what Trawlers owes the government, we note that Trawlers delayed rescinding the contract for a full year, and thus prejudiced the government's position. Trawlers discovered the alleged misrepresentation in August 1984, but failed to seek rescission until August 1985. Had Trawlers rescinded its contracts with the government *before* the Service paid off Trawlers' loans, the government could have taken measures to protect itself. Trawlers, however, waited until the government actually had honored its guaranties and had paid the bank over two million dollars. Because Trawlers' inaction for a full year severely prejudiced the government, we believe it is no longer possible for Trawlers to return the government to the position it enjoyed before it guaranteed Trawlers' refinancing package. We hold, therefore, that Trawlers can no longer rescind the guaranty contracts.[20]

---

20. This case illustrates why American contracts law uniformly requires a party claiming wrongful inducement to seek rescission shortly after discovering the misrepresentation. *See Regional Properties v. Financial & Real Estate Consulting Co.*, 752 F.2d 178 (5th Cir.1985) (applying Texas law); *Baker v. Penn Mutual Life Ins. Co.*, 788 F.2d 650 (10th Cir.1986) (applying Kansas Law); *Mariner Water Renaturalizer v. Aqua Purification Systems*, 665 F.2d 1066 (D.C.Cir.1981)

## IV.

The district court found that, as of the first day of its bench trial (October 27, 1986), Trawlers owed the government $407,879.77 under the Service's direct loan program. This finding is not clearly erroneous, and we affirm it. On remand, we direct the district court to enter judgment in the government's favor on the direct loans for $407,879.77, with interest as provided by law.

Because the district court held that Trawlers could avoid its obligations under the refinancing contracts, the court never determined the outstanding balance of Trawlers' guaranteed loans. On remand, the district court should determine this balance as of October 27, 1986, and enter judgment for the government accordingly with appropriate provision for any interest.

The judgment of the district court is REVERSED, and this matter is REMANDED to the district court for further proceedings not inconsistent with this opinion.

(applying District of Columbia Law). *See also* 12 S. Williston, Williston on Contracts § 1460 (3d ed. 1970). It is simply unfair for one party to acquire an indefinite, unbargained-for right to rescind a contract which the other party must continue to perform. Indeed, had the government argued that Trawlers failed to act soon enough to rescind the contracts, we could have disposed of this case on this issue alone. Neither the district court nor this court, however, has heard the government object to Trawlers' long delay in asserting its right to rescind these contracts. Consequently, we are unable to apply this rule here.