914 F.2d 258
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cheryl SHUMAN, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee,
and
Troy Design, Inc., Defendant.
 No. 89-1923.
 United States Court of Appeals, Sixth Circuit.
 Sept. 6, 1990.
 
 Before KRUPANSKY and BOGGS, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Cheryl Shuman brought this discriminatory and retaliatory discharge case against General Motors and Troy Design, Inc. under both federal and Michigan statutes. Shuman settled with Troy Design and the district court granted summary judgment to General Motors on all counts. For the following reasons, we affirm the district court's decision.
 
 
 2
 * Cheryl Shuman is a Black woman. She began working for Troy Design, Inc. in January 1986. Troy is one of several companies that do contract work for, among other companies, General Motors. In May 1987, Shuman was assigned to work as a detailer at the General Motors Buick-Oldsmobile-Cadillac (BOC) plant. She was supervised by General Motors personnel. Shuman was the only Black and the only woman in the department in which she worked. In August 1987, she complained to her supervisor, Robert Norris, that a co-worker named Scott Aeronowsky (an employee of a different subcontractor, Modern Engineering), whose job it was to review Shuman's work, had screamed and yelled at her. In her complaint in this action, Shuman alleged generally that Aeronowsky harassed her in a manner that differed from his behavior towards other workers in the department. She did not allege that Aeronowsky made remarks of a racial or sexual nature, however. Norris investigated the incidents, determined that a personality conflict existed, and arranged to reduce direct contact between Shuman and Aeronowsky.
 
 
 3
 On September 30, 1987, Norris left on Shuman's desk a note regarding an assignment he had given her. Shuman discovered a photocopy of a hand-drawn cartoon on the back of the note. The cartoon depicted a named male employee and a snake wearing glasses and a skirt. Shuman interpreted the cartoon to refer to her and to imply that she had a sexual interest in the male employee and found it offensive. Her name was not used, nor does she contend that the cartoon character recognizably resembled her. Another employee later admitted drawing the cartoon, but claimed to have no idea how a copy of it came to be attached to the note Norris left Shuman. He also denied that it was meant to depict Shuman. Norris disclaimed all knowledge of the cartoon.
 
 
 4
 On October 28, 1987, Shuman's lawyer sent a letter to Roger Masch of General Motors, complaining generally about racial and sexual harassment of Shuman in her department and in particular mentioning the cartoon. The letter stated that Shuman had contacted the attorney "regarding a complaint she was expecting to file with the EEOC, which would then be referred to the Michigan Department of Civil Rights ..."
 
 
 5
 General Motors investigated the allegations in the letter and concluded that they were without merit. Design Group Manager Al Martin and others met with Shuman, Norris, Aeronowsky, and representatives from Troy. On November 4, 1987, Shuman filed a charge of race discrimination with the Michigan Department of Civil Rights (M.D.C.R.) against Troy Design. The complaint did not mention General Motors. Also on November 4, after being asked by Troy how her concerns could be addressed, Shuman wrote out a list of complaints, entitled "Actions I'll [sic] like to see taking [sic]." These included disciplinary actions against Norris and Aeronowsky, and relocation of Aeronowsky to another plant.
 
 
 6
 On November 18, 1987, Shuman's lawyer sent another letter to Roger Masch at General Motors, complaining that no action had been taken to "alleviate" the alleged harassment complained about in the October 28 letter. Unlike the October 28 letter, this letter made no mention of the possibility of Shuman filing a civil rights charge against General Motors.
 
 
 7
 General Motors reviewed Shuman's November 4 list of concerns and concluded that it could not meet them. During November 1987, Al Martin received reports from Norris that Shuman was becoming belligerent and disruptive at work. Norris also reported that Shuman openly read the newspaper on the job. In mid to late November, Martin discussed with Troy officials the possibility of Troy transferring Shuman to another position. Shortly thereafter, Troy officials told Martin that they could not find any place to move Shuman. On December 2, 1987, Martin requested that Troy remove Shuman from the BOC premises by December 4. On December 3, 1987, Troy terminated Shuman's employment.
 
 
 8
 Shuman filed a charge of race and sex discrimination against Troy with the M.D.C.R. on December 11, 1987. On January 15, 1988, she filed a similar charge of discrimination against General Motors. This was the first civil rights charge Shuman had filed against General Motors. On February 8, 1988, Shuman brought this action against Troy and General Motors in Genesee County court, alleging six counts of race and sex discrimination and retaliatory discharge in violation of the Elliott-Larsen Civil Rights Act (M.C.L. Sec. 37.2101 et seq.), the Michigan Whistle-Blowers Act (M.C.L. Sec. 15.361 et seq.), and 42 U.S.C. Sec. 1981. The defendants removed the case to federal district court on the basis of federal question jurisdiction. Shuman and Troy reached a settlement. On April 20, 1989, the district court granted the motion of General Motors for summary judgment on all counts. Shuman filed a motion for reconsideration, which was denied on June 29, 1989. Shuman then appealed.
 
 
 9
 As the district court noted in its June 29, 1989 opinion, Shuman has been employed by another subcontractor of General Motors at another General Motors plant since March 1988.
 
 II
 
 10
 We note first that claims of sex discrimination in employment are not actionable under 42 U.S.C. Sec. 1981.[1] Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586 (1976); DeGraffenreid v. General Motors Assembly Division, 558 F.2d 480 (8th Cir.1977). Therefore, appellant's sex discrimination claims are cognizable, if at all, only under the Michigan statute.
 
 A. Race and sex discrimination
 
 11
 The district court correctly found that appellant produced no evidence that the loss of her employment was due to race or sex discrimination. Appellant's claim is essentially one of disparate treatment. Shuman claims that she was treated differently from a white male employee named Bruce McDougall by not receiving any warning from her superiors and by being terminated rather than transferred. By contrast, she alleges, McDougall, who had been coming to work late, taking excessively long lunch hours, and talking during work hours, was given several warnings by Bob Norris about his performance before being removed from the BOC plant and transferred to another General Motors facility.
 
 
 12
 Appellant's federal claim of discriminatory discharge should be analyzed according to the burden-shifting standard established in McDonnell Douglas v. Green, 411 U.S. 792 (1973). A similar standard is applied to claims arising under Michigan's Elliott-Larsen Act. In order to make out a prima facie case of discrimination under the Elliott-Larsen Act, the plaintiff must show that she was a member of a class entitled to protection under the statute and that, for the same or similar conduct, she was treated differently from one who was not a member of a protected group. Pompey v. General Motors, 189 N.W.2d 243 (1971).
 
 
 13
 The district court found that the situation involving McDougall was not comparable to that of Shuman. It distinguished between McDougall's behavior, which amounted to "lack of commitment," and appellant's behavior, which amounted to "insubordination." We agree with the district court's analysis, at least insofar as it suggests that the different behavior of the two employees justified the different responses of the General Motors management. By the time General Motors made its decision to remove appellant from its premises, she had already had the opportunity to air her grievances and management understood her position with regard to her co-workers. Under the circumstances, it did not indicate discriminatory animus for General Motors to conclude that warnings would prove more productive in the McDougall case than in appellant's case.
 
 
 14
 There is also another relevant difference between McDougall and appellant that explains the difference in their ultimate treatment. McDougall was not employed by Troy. He worked for another company that did contract work for General Motors. Therefore, while he may have been similarly situated to appellant as a contract employee of General Motors, he was not similarly situated to her with respect to his relationship with his primary employer. General Motors removed both McDougall and appellant from their positions at the BOC plant. McDougall's company had another position to which it could transfer him; Troy did not have such a position for Shuman. Appellant alleges that General Motors treated McDougall more favorably by assisting in placing him in another position. The record shows that Bob Norris suggested to McDougall's employer that he be transferred to another facility that was doing work for General Motors. (J.A. at 212-14) The record also shows, however, that Al Martin of General Motors discussed with Troy representatives the possibility of Troy's placing appellant in another position. He then waited approximately a week to hear from the Troy officials whether they had found such a position before he took any further action. (J.A. at 199-201). The differences in the treatment of McDougall and appellant by General Motors therefore do not give rise to an inference of discrimination. Moreover, General Motors apparently had no objection to appellant's working in another of its plants within 3 or 4 months of her removal from the BOC plant.
 
 
 15
 Despite appellant's allegations of sexual harassment on the job, this is not a "hostile environment" case. Appellant's argument is that the sexual harassment she allegedly experienced was related to her discharge. The nature of that relationship, however, is not clear. Insofar as appellant is arguing that she was removed from her job because she was a woman, she has failed to establish a prima facie case of sex discrimination. The only items of evidence that appellant presents to support that claim are the hand-drawn cartoon and an unnamed co-worker's isolated comment to her that the hot weather was "just like sex." Neither rises to the level of establishing a prima facie case of sex discrimination. Insofar as appellant is arguing that she was removed because she complained about the sexual harassment, we agree with the district court that the claim is subsumed in her retaliatory discharge claim.
 
 B. Retaliatory discharge
 
 16
 Summary judgment was properly granted on the claim of retaliatory discharge as well. The Elliott-Larsen Act prohibits discrimination or retaliation against a person "because the person has opposed a violation of this act or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." M.C.L. Sec. 37.2701(a). These two components have been referred to, respectively, as the "opposition clause" and the "participation clause." Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1312 (6th Cir.1989). In order to establish a prima facie case of retaliatory discharge under the Act, the plaintiff must show (1) that she opposed violations of the Act or participated in an activity protected by the Act, and (2) that her opposition or participation was a "significant factor" in her discharge. Polk v. Yellow Freight System, Inc., 801 F.2d 190, 199 (6th Cir.1986). A "significant factor" is more than a mere "causal link," but less than a "but-for" cause. Ibid. Where these two elements are shown, the defendant may rebut the inference of retaliation by offering a legitimate reason for the discharge, whereupon the plaintiff may respond with evidence that the stated reason is a pretext. Taylor v. General Motors Corp., 826 F.2d 432, 456 (6th Cir.1987).
 
 
 17
 In this case, Shuman did not file charges against General Motors with the Michigan Civil Rights Commission until after her discharge. Clearly, therefore, her retaliation claim cannot be based on the filing of that complaint. Appellant argues that her discharge was in retaliation for her intent to file charges, as evidenced by the October 28 and November 18 letters from her lawyer to General Motors.
 
 
 18
 In Polk, this court held that an employee's visit to the Michigan Civil Rights Commission office to inquire about rights under the Act was sufficient to trigger the Act's protection against retaliation, even though such charges were not actually filed until after discharge. In Booker, by contrast, we held that a plaintiff's letter to his employer complaining of racial discrimination constituted neither the "participation in a protected activity" nor the "opposition to a violation of the Act" necessary to trigger the protection of the Act.
 
 
 19
 The facts of this case fall between Polk and Booker. Appellant had not initiated the filing of a charge, as in Polk, but she had stated more than "a vague charge of discrimination," as in Booker. Moreover, unlike the letter in Booker, appellant's October 28 letter specifically mentioned the likelihood of a charge being filed. The November 18 letter did not mention the possibility of filing charges against General Motors, and therefore cannot be considered protected activity. However, because the October 28 letter clearly informed General Motors of the likelihood that Shuman would file charges with the M.D.C.R. and the EEOC, the sending of that letter can be considered a protected activity under the Elliott-Larsen Act.
 
 
 20
 The next question is whether the letter constituted a "significant factor" in appellant's dismissal. Because there are no other indicia of retaliation, the inference of retaliation that appellant hopes to raise must rest entirely on the nearness in time of the October 28 letter to the December 2 request for her removal from the BOC plant. Drawing such an inference calls for caution. We have never defined a precise time span beyond which an inference of retaliation may not be created in the absence of affirmative evidence of retaliatory animus. In Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986), this court held that the mere fact that the plaintiff was discharged four months after filing a discrimination claim was insufficient to support an inference of retaliation. See also Brown v. ASD Computing Center, 519 F.Supp. 1096, 1116-17 (S.D. Ohio 1981), aff'd sub nom. Brown v. Mark, 709 F.2d 1499 (6th Cir.1983) ("This court agrees with the utility of such an inference, but would hesitate to expand its scope ... where there are no other indicia of retaliation.") However, courts have permitted a prima facie case of retaliation based on the propinquity in time between a protected action and a discharge. Miller v. Fairchild Industries, Inc., 797 F.2d 727, 731-32 (9th Cir.1986) (two months between protected activity and discharge); Love v. Re/Max of America, Inc., 738 F.2d 383, 386 (10th Cir.1984) (two hours); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980) (two months); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir.1980) (twenty days); Summers v. Allis Chalmers, 568 F.Supp. 33, 37 (N.D.Ill.1983) (twelve days); Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F.Supp. 318, 324-25 (D.Mass), aff'd, 545 F.2d 222 (1st Cir.1976) (two years). With the exception of Hochstadt, these cases have involved short periods of time, mostly two months or less. The time between the October 28 letter from appellant's lawyer to General Motors and the December 2 call from Al Martin requesting that Troy remove appellant from the BOC premises was five weeks. Because the letter informed General Motors of the likelihood of charges being filed against it and because it set in motion a chain of events (investigation, request for complaints from Shuman, attempts to accommodate Shuman by transfer) that spanned the five weeks up to her discharge, it would appear that the nearness in time between the letter and the discharge may have been sufficient to create a (rebuttable) inference of retaliation.
 
 
 21
 Appellant's argument fails, however, at the next stage of the analysis. General Motors gave a legitimate reason for its decision to ask that Shuman be removed from the plant. Al Martin testified that he had received reports from Bob Norris during November 1987 that appellant was engaging in belligerent behavior, that she read newspapers on the job, and that she did not seem willing to work with Norris or Aeronowsky. After reviewing appellant's November 4 list of complaints, and concluding that it could not justify disciplining or transferring Norris or Aeronowsky, General Motors made the decision that the best solution to what had become an unworkable situation was to ask Troy to place appellant in another job. By articulating a legitimate, non-retaliatory explanation for its decision to ask that Troy remove appellant from the BOC plant, General Motors rebuts the inference of retaliation created by the five-week interval between the October 28 letter and the discharge, and it places the burden on appellant to show that the stated reason was a pretext.
 
 
 22
 Appellant's argument for pretext is that there was no evidence that she ever disobeyed a request of her superiors or that she refused to do work. Those assertions, however, are not responsive to the reasons stated by General Motors for its decision to ask that she be removed. General Motors cited a poor work attitude and an unwillingness to work with certain co-workers by appellant, and an absence of flexibility in fashioning a solution because of appellant's position that those co-workers should be disciplined or transferred. It did not rest on specific instances of appellant's refusal to work or to take orders.[2]
 
 
 23
 As appellant has not produced evidence to raise a genuine issue of material fact as to the pretextual nature of General Motors's legitimate, non-discriminatory reason for ordering her removal, the decision of the district court granting summary judgment to General Motors is AFFIRMED.
 
 
 
 [1]
 The circuits are divided over whether claims of discriminatory discharge are cognizable at all under 42 U.S.C. Sec. 1981, in light of the decision in Patterson v. McLean Credit Union, 109 S.Ct. 2363 (1989). See, e.g., McKnight v. General Motors Corp., Nos. 89-1379/1526, 1990 U.S.App. LEXIS 11036 (7th Cir. July 2, 1990); Courtney v. Canyon Television & Appliance Rental, Inc., 899 F.2d 845 (9th Cir.1990); and Lavender v. V & B Transmissions & Auto Repair, 897 F.2d 805 (5th Cir.1990) (all holding that a discharge case is not cognizable under Sec. 1981); Hicks v. Brown Group, Inc., 902 F.2d 630 (8th Cir.1990) (discharge cognizable under Sec. 1981). The parties did not address the issue in this case and we do not address it on appeal
 
 
 [2]
 Appellant makes much of the district court's characterization of the ground for her removal as "insubordination." (April 20, 1989 Memorandum Opinion and Order, at 4) We agree with the district court's later statement in its order denying reconsideration that "the difference between 'insubordination' and 'disruptive influence' under these circumstances amounts to no more than semantics." (June 26, 1989 Memorandum Opinion and Order, at 1)